**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date:  April 23, 2014

Docket No. 32,559

BUKE, LLC,

     Plaintiff-Appellant,

v.

CROSS COUNTRY AUTO SALES, LLC,
CROSS COUNTRY AUTO SALES WESTSIDE,
LLC, SOUTHWEST AUTO WHOLESALE,
LLC, CAS, LLC, JOHN CHIADO, JOE CHIADO,
JOHN T. REILLY, BEDO, LLC, JOHN PERNER,
and PERNER AND MICHNOVICZ, LLC,

     Defendants-Appellees.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Ted Baca, District Judge

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
John J. Kelly
Michelle A. Hernandez
Kevin D. Pierce
Albuquerque, NM

for Appellant

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM
Law Office of Chris Key
Chris Key
Albuquerque, NM

for Appellees Cross Country Auto Sales, LLC;
Cross Country Auto Sales Westside, LLC;
Southwest Auto Wholesale, LLC; CAS, LLC;

1

John Chiado; John T. Reilly, and BEDO, LLC

Law Office of Jack Brant, P.C.
John M. Brant
Jeannie Hunt
Albuquerque, NM

for Appellees John Perner and Perner and Michnovicz, LLC

**OPINION**

**VANZI, Judge.**

**{1}**    This lawsuit arises from a dispute concerning the use of certain assets of Plaintiff-Appellant BUKE, LLC (BUKE), a limited liability company (LLC) car dealership, by BUKE's manager, Randall Eastburg, who was also a member of BUKE and of Defendant LLC car dealerships. Rounding out the named Defendants are other members of Defendant LLC car dealerships, along with a certified public accountant (CPA) and his accounting firm.

**{2}**    The case involves many players, claims, and contentions, but resolution of the central issues raised in this appeal turns primarily on one disputed point—whether Eastburg had the requisite consent to use the assets in question. We conclude that the only reasonable conclusion to be drawn from the undisputed material facts is that he did, so we affirm the district court's summary judgment rulings in favor of Defendant LLC car dealerships and their members. We also affirm the district court's entry of summary judgment dismissing the accountant malpractice claim and its denial of BUKE's motion to amend the scheduling order.

## I.    BACKGROUND

### A.    The Parties

**{3}**    BUKE was formed in 2005 with the following members: Brian Urlacher (32.5%), Turner and Margaret Branch (20%), Bryce Karger (15%), and Randall and Lisa Eastburg (32.5%).[1]

**{4}**    Defendants fall into three groups: (1) Albuquerque used car dealerships Cross Country Auto Sales Eastside, LLC and Cross Country Auto Sales Westside, LLC, along with Albuquerque wholesale dealership Southwest Auto Wholesale, LLC (collectively, Cross

---

[1]The parties do not mention Margaret Branch and Lisa Eastburg, other than to initially note the fact of their membership in BUKE. Accordingly, "Branch" refers to Turner Branch and "Eastburg" to Randall Eastburg.

Country LLCs); (2) Cross Country LLCs' members: John T. Reilly and BEDO, LLC (BEDO), which consists of six members of the Chiado family, two of whom are also named Defendants (collectively, Cross Country Members)[2]; (3) John Perner, a CPA who provided services to BUKE and the Cross Country LLCs, and his accounting firm, Perner and Michnovicz (collectively, the Accountants).

**B.      The Undisputed Material Facts**

**1.      Eastburg's Relationships With the Parties**

**{5}**      Eastburg was an experienced owner and operator of car dealerships, who operated the Cross Country LLCs since 1998. Eastburg continued to be a member of the Cross Country LLCs and to operate those dealerships after he became involved with BUKE in 2005. All of BUKE's members were aware of Eastburg's involvement with the Cross Country LLCs.

**{6}**      Eastburg was also a member and manager of a used car dealership in Lovington, New Mexico called "Brian Urlacher Cross Country Auto Sales LLC" (Lovington Dealership), in which Urlacher and Karger had an ownership interest. Turner Branch was the only BUKE member who did not hold a membership interest in the Lovington Dealership.

**2.      Eastburg's Management and Use of Certain BUKE Assets**

**{7}**      BUKE selected Eastburg to be its sole manager at its inception in 2005, and Eastburg held that position until 2009. As discussed further below, BUKE's operating agreement (Operating Agreement) prohibited BUKE's members from participating in "the control, management, direction or operation" of BUKE's affairs and gave BUKE's manager (Eastburg) "the exclusive right to manage all of" BUKE's affairs, subject to certain limitations.

**{8}**      In 2006, BUKE bought the assets of a General Motors (GM) new car dealership in Tucumcari, New Mexico (Tucumcari Dealership) and named it "Brian Urlacher Cross Country Autoplex." As a GM franchisee (via the Tucumcari Dealership), BUKE had access to GM "credentials," also known as a "badge," which allowed BUKE to purchase low-mileage GM vehicles at closed GM auctions (GM Badge). BUKE also had a General Motors Acceptance Corporation (GMAC) credit line (also known as a "floor plan"), which allowed BUKE to finance the vehicles it purchased at low interest rates (Credit Line).

**{9}**      Eastburg testified that access to the GM Badge and Credit Line was one of the reasons he wanted to become involved with the Tucumcari Dealership. The Tucumcari

---

[2]Eastburg was also a member of the Cross Country LLCs. As discussed below, BUKE dismissed its claims against Eastburg.

3

Dealership's former owner was aware that Eastburg was going to use the GM Badge during the management contract period. Eastburg told Karger that he was going to use the GM Badge to purchase vehicles for the Cross Country LLCs, although he does not recall discussing use of the GM Badge or Credit Line for this purpose with Urlacher or Branch. Karger did not object, although some details of that conversation are disputed: Karger testified that, during their conversation, Eastburg promised that the Cross Country LLCs would pay BUKE $500 for each vehicle it purchased using the GM Badge, while Eastburg said that he does not remember making this promise and that he never would have made it because that amount would be excessive. The Cross Country LLCs never paid BUKE a per-vehicle fee.

**{10}** Once BUKE began operating the Tucumcari Dealership in 2006, Eastburg arranged with one of BUKE's employees to obtain GM Badges for himself and others working for him to purchase vehicles at closed GM auctions. BUKE's employees understood that Eastburg was authorized to do so. Thereafter, Eastburg used the GM Badges to purchase and sell vehicles for BUKE, the Lovington Dealership, and the Cross Country LLCs. Eastburg also arranged with BUKE's employees for the Cross Country LLCs to reimburse BUKE for the vehicles that were purchased for them at GM auctions on the Credit Line. The Cross Country LLCs' lender, New Mexico Bank & Trust, was aware that Eastburg was purchasing vehicles for the Cross Country LLCs on BUKE's Credit Line.

**{11}** Eastburg publicized that he was using the GM Badge and Credit Line to purchase vehicles for all of the dealerships he operated. For instance, in March 2007, Eastburg gave an interview for an article published in the New Mexico Business Weekly. That article discussed all of the dealerships Eastburg operated, referring to them collectively as "Cross Country" notwithstanding their different ownerships. It also stated that "[t]he GM Tucumcari deal is huge because it will give Eastburg access to all GM auto auctions, as well as to GM financing for his inventory of cars, both new and used." BUKE posted the article on its website. Eastburg also spoke openly to Albuquerque newspapers about "moving inventory between the various stores with which [he] was affiliated[.]"

### 3. Perner's Determinations Concerning the Credit Line

**{12}** Perner was not involved in BUKE's day-to-day bookkeeping. However, in May 2008, Eastburg, on behalf of BUKE, hired Perner to perform two discrete accounting services for BUKE: prepare tax returns for 2006, 2007, and 2008; and prepare a Reviewed Financial Statement (RFS) for 2007. Perner had previously prepared tax returns for two of the Cross Country LLCs. Shortly after BUKE hired him as an accountant, Perner also became a member of a newly created business, Cross Country Auto Parts, LLC, whose other members were Eastburg, two Cross Country Members, and three other individuals.

**{13}** While preparing the RFS in May 2008, Perner determined that the Credit Line was "out of trust," meaning that the amount BUKE owed GMAC exceeded the value of BUKE's inventory on the car lot floor at the Tucumcari Dealership. Perner also determined that one

4

of the Cross Country LLCs had six BUKE vehicles in its inventory for which it had not paid BUKE. The RFS disclosed this. Perner gave multiple copies of the RFS to Eastburg to distribute to BUKE's other members. Both the RFS and the tax returns were accurate and correct. BUKE never paid $15,796.75 of the balance it owed Perner for the preparation of the tax returns and RFS.

**{14}** Sometime in 2008, Branch began receiving notices from GMAC that payments were not being timely made on the Credit Line. Because Branch was not receiving monthly financial statements from BUKE's bookkeeper in Tucumcari and was unhappy to be receiving notices from GMAC, Branch requested a meeting with Perner, which occurred in August 2008. At that meeting, Perner said he would ensure that Branch started receiving the monthly statements from the Tucumcari Dealership, but he did not disclose anything else.

**{15}** In January 2009, GMAC wrote Eastburg and BUKE, advising that a recent audit showed untimely payments on the Credit Line for 66 out of 97 (68%) of the vehicles audited and that GMAC would increase BUKE's interest rates on the Credit Line by 100 basis points (1%) until BUKE's wholesale performance complied with the requirements of the Wholesale Security Agreement.

**{16}** Branch, who is the only BUKE member who is not also an owner of the Lovington Dealership, is also the only BUKE member who testified that he was not aware of Eastburg's use of BUKE's GM Badge and Credit Line to benefit the Cross Country LLCs until 2009. There is no testimony from Urlacher in the record. None of BUKE's members ever objected to Eastburg's use of BUKE's GM Badge and Credit Line to purchase vehicles for the Cross Country LLCs until Branch started investigating the late payments on the Credit Line.

## C.    Procedural History

**{17}** BUKE filed its complaint in June 2009 and filed an amended complaint in February 2011. The first amended complaint asserts the following claims: an unjust enrichment claim against the Cross Country LLCs and Cross Country Members; claims for conversion, accounting, unfair competition, violation of New Mexico's Unfair Practices Act, intentional interference with existing contractual relationship, intentional interference with prospective contractual relationship, and violation of the New Mexico Racketeering Act, against the Cross Country LLCs; and a professional malpractice claim against the Accountants.[3] The Eastburg Defendants, Eastburg Partners, and Cross Country LLCs' attorneys were voluntarily dismissed from the case prior to appeal.

**{18}** BUKE challenges the district court's rulings on several motions: (1) the Cross

---

[3]The first amended complaint also asserted claims against the Cross Country LLCs' attorneys, the "Eastburg Defendants," and "Eastburg Partners," which were voluntarily dismissed prior to appeal.

Country Members' motion for summary judgment on the unjust enrichment claim, on the ground that they were protected by the Cross Country LLCs' "corporate shield," which the district court granted; (2) the joint motion for summary judgment filed by the Cross Country LLCs and Cross Country Members, on the ground that no evidence supported the core factual allegation underlying BUKE's claims that Eastburg did not have permission to use BUKE's GM Badge and Credit Line to benefit the Cross Country LLCs, which the district court also granted; (3) BUKE's motion for summary judgment on its conversion claim, based on this same factual issue, which the district court denied; (4) BUKE's motions to reconsider the rulings on the motions filed by the Cross Country LLCs and Cross Country Members; (5) the Accountants' motion for summary judgment on the accountant malpractice claim, on the ground that BUKE did not have an expert witness, which the district court granted; (6) BUKE's motion to modify the scheduling order, including the deadline for disclosing expert witnesses, which the district court denied.

## II.    DISCUSSION

**{19}**    We first consider the district court's summary judgment rulings in favor of Defendants, which we review de novo. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. We then address the court's denial of BUKE's motion to amend the scheduling order, which we review for an abuse of discretion. *See Reaves v. Bergsrud*, 1999-NMCA-075, ¶ 13, 127 N.M. 446, 982 P.2d 497.

## A.    The Summary Judgment Standard

**{20}**    "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self*, 1998-NMSC-046, ¶ 6; *see* Rule 1-056(C) NMRA; *Bartlett v. Mirabal*, 2000-NMCA-036, ¶ 17, 128 N.M. 830, 999 P.2d 1062. The appellate courts "view the facts in a light most favorable to the party opposing summary judgment and draw all reasonable inferences in support of a trial on the merits." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted).

**{21}**    Once the summary judgment movant has made a prima facie case, the burden shifts to the non-movant to establish reasonable doubt as to the existence of a genuine issue of material fact. *Bartlett*, 2000-NMCA-036, ¶ 17. The non-movant may not rely on allegations or speculation, but must come forward with admissible evidence demonstrating a genuine issue requiring trial and also demonstrate that facts allegedly in dispute are material to the claims at issue. Rule 1-056(E); *Romero*, 2010-NMSC-035, ¶¶ 10-11. Materiality is determined by the governing substantive law; the inquiry is whether the fact is necessary to give rise to a claim. *Romero*, 2010-NMSC-035, ¶ 11. "Summary judgment is appropriate when a defendant negates an essential element of the plaintiff's case by demonstrating the absence of an issue of [material] fact regarding that element." *Mayfield Smithson Enters. v. Com-Quip, Inc.*, 1995-NMSC-034, ¶ 22, 120 N.M. 9, 896 P.2d 1156. Thus, summary judgment may be granted even though disputed factual issues remain. *Tapia v. Springer*

*Transfer Co.*, 1987-NMCA-089, ¶ 8, 106 N.M. 461, 744 P.2d 1264.

**B.  The District Court Properly Entered Summary Judgment, Dismissing BUKE's Claims Against the Cross Country LLCs and Members**

**1.  The District Court Correctly Concluded That Eastburg Used BUKE's GM Badge and Credit Line With the Consent of a Majority of BUKE's Members**

**{22}** BUKE contends that the district court erred in entering summary judgment in favor of the Cross Country LLCs and Members on all claims and in denying its cross motion for partial summary judgment. The dispositive issue is whether Eastburg used BUKE's GM Badge and Credit Line with the requisite permission of BUKE's members. For the reasons set forth below, we affirm.

**a.  The Act and Operating Agreement**

**{23}** An LLC is an entity created by statute—the New Mexico Limited Liability Company Act (the Act), codified at NMSA 1978, §§ 53-19-1 to -74 (1993, as amended through 2003). The stated policy of the Act is "to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements of [LLCs]." Section 53-19-65(A). This policy is reiterated in various provisions of the Act that explicitly state that they apply "[e]xcept as provided" or "[u]nless as otherwise provided" by the LLC's articles of incorporation or operating agreement, or that otherwise allow for the operating agreement to dictate aspects of the LLC's operation. *See generally* §§ 53-19-1 to -74; *see, e.g.*, *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. Super. Ct. 1999) ("The Act is replete with fundamental provisions made subject to modification in the Agreement (*e.g.*, unless otherwise provided in a limited liability company agreement)." (omission, internal quotation marks, and footnote omitted)); F. Hodge O'Neal & Robert B. Thompson, O'Neal and Thompson's Close Corporations and LLCs: Law and Practice § 5:1 (Rev. 3d. ed. 2013) ("There are default rules in [LLC] statute[s] or in the . . . articles of organization filed with the state but most of the details about the rules for the entity are left to the operating agreement.").

**{24}** This general policy of deference to a New Mexico LLC's operating agreement is manifest in the plain text of Section 53-19-15(B), which provides that "[e]ach manager shall have such power to manage the business or affairs of the [LLC] as the articles of organization or an operating agreement shall provide." It is also clearly expressed in Section 53-19-16(D), which addresses use of LLC property by an LLC manager:

> *Unless otherwise provided by* the articles of organization or *an operating agreement*:
>
>         . . . .

D.    every member who is vested with particular management responsibilities by the articles of organization or an operating agreement and every manager shall account to the [LLC] and hold as trustee for it any profit or benefit he derives from:

. . . .

(2)    any use . . . of the company's property, including confidential or proprietary information of the [LLC] or other matters entrusted to him as a result of his status as a member or manager unless:

(a)    the material facts of the relationship of the interested manager or member to the contract, transaction or use were disclosed or known to all of the other managers or members who, in good faith, authorized or approved the contract, transaction or use by: 1) the affirmative vote of a majority of all of the disinterested managers; or 2) the affirmative vote of all of the disinterested members, even though all of the disinterested managers were less than a majority of all of the managers or even though all of the disinterested members did not have a majority share of the voting power of all of the members[.]

Section 53-19-16(D)(2)(a) (emphasis added).

**{25}**    The Act defines an "operating agreement" as "a written agreement providing for the conduct of the business and affairs of [an LLC.]" Section 53-19-2(O). The "operating agreement" is, in other words, a contract reflecting the terms governing the LLC's operations, as agreed to by the LLC members.

**{26}**    BUKE's Operating Agreement was entered into by its members. It contains several provisions concerning the manager, including the following sections relied upon by the parties:

4.1.    Liability of Members.  The liability of the Members shall be limited as provided in the Act. The Members shall take no part whatever in the control, management, direction or operation of the Company's affairs and shall have no power to bind the Company except when a Member is acting as a Manager. The Manager(s) may from time to time seek advice from the Members on major policy decisions but need not accept such advice, and at all times the Manager(s) shall have the exclusive right to control and manage the Company.

. . . .

4.2.1.    Authority.  Except to the extent otherwise provided herein, the Manager(s) shall have the exclusive right to manage all of the

8

affairs of the Company.

. . . .

4.2.8. Prohibitions. Without the consent of a majority of the Members, the Manager(s) shall not have the authority to:

. . . .

(c) possess the assets of the Company (including any real property or personal property assets), or assign rights in the assets of the Company, for other than a Company purpose[.]

**b. Statutory Analysis**

**{27}** "Statutory interpretation is an issue of law, which we review de novo." *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105. Our task is to determine and give effect to the Legislature's intent, looking first to the plain language of the statute and giving the words their ordinary meaning. *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135. In this case, the relevant text is clear.

**{28}** As noted, Section 53-19-65(A) plainly directs that the Act's provisions are to be construed "to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements of [LLCs]." Just as plainly, Section 53-19-16(D)(2) directs that its terms concerning use of LLC property by a manager do not apply if the terms of the LLC's articles of organization or operating agreement provide otherwise. Here, the pertinent terms of the Operating Agreement do provide otherwise, stating that "the Manager(s) *shall have the exclusive right to manage all of the affairs of the Company*," and prohibiting the manager only from "possess[ing]" or "assign[ing]" rights in the LLC's assets for other than a company purpose "[w]ithout the consent of a majority of the Members[.]" (Emphasis added.) We conclude that the statute requires that we construe the Operating Agreement as written and thus that Eastburg's use of the GM Badge and Credit Line was authorized if consented to by a majority of BUKE's members.

**{29}** The parties disagree as to whether Eastburg's "use" of BUKE's GM Badge and Credit Line falls within the ambit of the Operating Agreement's prohibition against the manager's "possess[ion]" or "assign[ment]" of BUKE assets "for other than a Company purpose" unless with the consent of a majority of BUKE's members. The Cross Country LLCs and Cross Country Members contend that Eastburg's "use" neither constituted an "assignment" nor amounted to "possession" of those assets and so was not prohibited at all by the Operating Agreement. Alternatively, they argue BUKE failed to meet its summary judgment burden to adduce evidence sufficient to support a reasonable inference that Eastburg lacked the consent of a majority of BUKE members required by the Operating

9

Agreement.

**{30}** In addition to arguing that there is a dispute of material fact on the issue of consent, BUKE makes several arguments aiming to establish that Section 53-19-16(D)(2)(a)'s provision requiring "the affirmative vote of a majority of all of the disinterested managers" must govern the manager's "use" of BUKE's assets, notwithstanding that the Operating Agreement requires only consent of a majority of BUKE's members for the manager to "possess" or "assign" BUKE's assets. We are not persuaded.

**{31}** For one thing, BUKE's strained construction contravenes the express policy of the Act "to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements of [LLCs]." Section 53-19-65(A). And its suggestion that the Act and Operating Agreement should be read to require "the affirmative vote of a majority of all of the disinterested managers" for mere "use" of BUKE assets by the manager, but only the consent of a majority of BUKE members for the manager to "possess" or "assign" BUKE assets, makes no sense, as a practical matter, or as a matter of statutory interpretation. *See* § 53-19-16(D)(2)(a). We see no "irreconcilable conflict among statutory provisions[,]" any mistake or "absurdity that the Legislature could not have intended," or any other reason to depart from the clear statutory mandate to enforce the Operating Agreement as written. *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 28, 125 N.M. 401, 962 P.2d 1236.

**{32}** In any event, BUKE concedes that the Operating Agreement addresses the manager's "use" of BUKE assets, stating that it provides that "consent of a majority of BUKE's members is required to use company assets for other than a company purpose." Given this concession and the plain language of the Act and Operating Agreement, BUKE's contentions that the Act's provision requiring an affirmative vote of the majority of disinterested members applies because it is "more specific" and that the Act's default provisions apply unless "repugnant" to the Operating Agreement's terms fail. BUKE has not cited any persuasive authority for these arguments, and we have found none.

**{33}** Our conclusion that the Operating Agreement controls on the facts of this case comports with rulings in other states. *See NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 418 n.17 (Del. Ch. 2007) (noting that an LLC agreement can create a contractual inspection right broader or narrower than that created by statute), *aff'd*, 945 A.2d 594 (Del. 2008); *Lenticular Europe, LLC ex rel. Van Leeuwen v. Cunnally*, 693 N.W.2d 302, 307 (Wis. Ct. App. 2005) (noting that when provisions in the LLC statute state that they apply unless otherwise provided in an operating agreement, those provisions allow members of an LLC to choose to be governed by terms that differ from those in the statute); *see also Maldonado ex rel. Maldonado v. SmithKline Beecham Corp.*, 841 F. Supp. 2d 890, 894 (E.D. Pa. 2011) (holding that the statutory default provision requiring that an LLC's management shall be vested in its members does not apply where the operating agreement provided otherwise); *Overhoff v. Scarp, Inc.*, 812 N.Y.S.2d 809, 818-19 (Sup. Ct. 2005) (holding that the operating agreement's quorum terms superseded statutory requirements); Phillip L.

Jelsma and Pamela Everett Nollkamper, The Limited Liability Company § 1:10 (2013) (stating that one of the primary benefits of an LLC is that it "is a highly flexible entity").

**c.** **Summary Judgment on Eastburg's Authority Issue Was Proper**

**{34}** BUKE contends that Eastburg failed to inform and concealed from BUKE's members his use of the GM Badge and Credit Line to benefit the Cross Country LLCs and Cross Country Members; failed to obtain the requisite authority from BUKE's members; and that this "means that Eastburg's use of BUKE's credentials and credit line was unauthorized." Having determined as a matter of law that Eastburg's actions were authorized if he had the consent of a majority of BUKE's members as required by the Operating Agreement, we consider whether the summary judgment record supports the district court's rulings in favor of the Cross Country LLCs and Cross Country Members on the consent issue.

**{35}** We frame the analysis. Our task is to interpret and apply the terms of BUKE's Operating Agreement as written; we may not rewrite the contract the members made for themselves. *See CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 1987-NMSC-117, ¶ 6, 106 N.M. 577, 746 P.2d 1109 ("When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties."); *see also W. Farm Bureau Ins. Co. v. Carter*, 1999-NMSC-012, ¶ 4, 127 N.M. 186, 979 P.2d 231 (noting that contract interpretation is a matter of law reviewed de novo).

**{36}** Unlike Section 53-19-16(D), which the members chose not to adopt, BUKE's Operating Agreement provides no specific requirements by which a manager must obtain member consent, such as prior, written, or express consent; nor can we read any such requirement into the Operating Agreement, where BUKE has presented no evidence that its members intended to include it. *See Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 15, 120 N.M. 680, 905 P.2d 718 ("We will not read into a contract conditions not intended by the parties."). We therefore apply the Operating Agreement's requirement that a majority of BUKE's members "consent" using the ordinary meaning of the word. *See Crownover v. Nat'l Farmers Union Prop. & Cas. Co.*, 1983-NMSC-099, ¶ 16, 100 N.M. 568, 673 P.2d 1301 ("Absent express language to the contrary, a court should apply the every day meaning in interpreting the terms of a contract."). Without any modifier, "consent" simply means "[a]greement, approval, or permission as to some act or purpose," which can be inferred. *See Black's Law Dictionary* 346 (9th ed. 2009); *Webster's II New College Dictionary* 240 (1995) (defining consent, in part, as "[v]oluntary allowance of what is planned or done by another"); *c.f. Kilpatrick v. Motor Ins. Corp.*, 1977-NMSC-019, ¶ 13, 90 N.M. 199, 561 P.2d 471 (noting that when an automobile insurance policy requires that permission of the named insured must be obtained for another to use the vehicle, and that the person granted permission to use the vehicle must act within the scope of that permission, permission may be implied from the conduct of the insured, including the insured's lack of objection); *Jessen v. Nat'l Excess Ins. Co.*, 1989-NMSC-040, 108 N.M. 625, 776 P.2d 1244 (stating that under

11

New Mexico law, ratification may be inferred by a principal's acquiescence in the results of an unauthorized act of an agent), *abrogated on other grounds as recognized by Teague-Strebeck Motors, Inc. v. Chrysler Ins. Co.*, 1999-NMSC-109, 127 N.M. 603, 985 P.2d 1183; *Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.*, 1981-NMCA-148, ¶ 15, 97 N.M. 266, 639 P.2d 75 ("One may infer affirmance by a principal of an unauthorized transaction of its agent from the principal's failure to repudiate it."). The parties do not dispute that the question whether there is a "majority" of BUKE's members is determined using the ownership percentages of each member.

**{37}** The Cross Country LLCs and Cross Country Members cite the following undisputed facts in support of their prima facie contention that Eastburg used the GM Badge and Credit Line with the consent of a majority of BUKE's members. *See Romero*, 2010-NMSC-035, ¶ 10 (stating that a summary judgment movant meets its "initial burden of establishing a prima facie case" when it presents "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted" (internal quotation marks and citation omitted)).

**{38}** When BUKE selected Eastburg as its manager, BUKE's other members knew that Eastburg already operated and would continue to operate the Cross Country LLCs. After Eastburg became BUKE's manager, BUKE adopted the "Cross Country Auto Sales" name for its Tucumcari dealership. Eastburg spoke openly to the media about the relationship between the Tucumcari, Albuquerque, and Lovington Cross Country LLC dealerships, including the fact that he was moving inventory among the different dealerships. For example, Eastburg's interview for the 2007 New Mexico Business Weekly article makes clear that Eastburg was using the GM Badge and Credit Line to purchase vehicles for the Cross Country LLCs. BUKE itself posted the Business Weekly article on its website.

**{39}** In addition, BUKE's staff and the Cross Country LLCs' bank were aware of Eastburg's use of BUKE's GM Badge and Credit Line for the Albuquerque Cross Country LLCs, and BUKE's staff even helped implement the arrangement. Moreover, all of BUKE's members, except for Branch, were also owners of the Lovington Dealership, and Eastburg used BUKE's GM Badge to benefit that dealership as well. Finally, none of BUKE's members objected to Eastburg's use of the GM Badge and Credit Line for three years, until Branch discovered that BUKE was late making payments on the Credit Line.

**{40}** This undisputed evidence establishes that Eastburg never concealed his intention to use the GM Badge and Credit Line to purchase vehicles for the Cross Country LLCs; that members within BUKE, including Karger, knew of Eastburg's intention, and that Eastburg's use of the GM Badge and Credit Line for this purpose was made public, including by the posting of Eastburg's interview on BUKE's own website. This evidence, in conjunction with the facts that for three years none of BUKE's members objected, and that Karger and Urlacher also benefitted from the same arrangement in their capacity as owners of the Lovington Dealership during that time, is sufficient to establish a presumption of fact (i.e., a prima facie case) that a majority of BUKE's members (Eastburg (32.5%), Urlacher

(32.5%), and Karger (15%)) consented to Eastburg's use of the GM Badge and Credit Line to purchase vehicles for the Cross Country LLCs. As a result, the burden shifted to BUKE "to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Id.* (internal quotation marks and citation omitted). BUKE failed to meet that burden.

**{41}** The only direct evidence relied upon by BUKE to support its contention that Eastburg lacked the requisite consent is Branch's deposition testimony that he did not know about or consent to Eastburg's use of the GM Badge and Credit Line to purchase vehicles for the Cross Country LLCs. BUKE presented no affidavit or deposition testimony from Urlacher. Instead, it simply asserts that we should infer that Urlacher did not consent from Branch's testimony that Branch did not know or consent, and Eastburg's testimony that he did not remember having a conversation with either Branch or Urlacher about using the GM Badge and Credit Line for the Cross Country LLCs. BUKE does not address the fact that Urlacher (unlike Branch) was an owner of the Lovington Dealership, which also benefitted from Eastburg's use of the GM Badge and Credit Line. Nor does BUKE attempt to rebut the evidence that Eastburg's use of these assets for three years was open and even publicized, including in an article posted on BUKE's own website.

**{42}** As to Karger, BUKE's own evidence confirms that he knew, beginning in 2006, about Eastburg's use of the GM Badge to purchase vehicles for the Cross Country LLCs and did not object. Although the parties dispute whether Eastburg told Karger that he would pay BUKE $500 for each vehicle bought at a closed GM auction, the dispute is immaterial. Even assuming that Karger (15%) consented only because of Eastburg's alleged promise to pay $500 per vehicle, BUKE has set forth no specific evidentiary facts to demonstrate that Eastburg (32.5%) and Urlacher (32.5%), who together hold a majority ownership interest in BUKE, did not consent.

**{43}** In sum, the specific evidentiary facts proffered by BUKE are insufficient to support a reasonable inference that Eastburg lacked the consent of a majority of BUKE's members to use BUKE's assets as he did. *See id.* (explaining that non-movant "may not simply argue that such evidentiary facts might exist," but "must adduce evidence to justify a trial on the issues[,]" which in turn "must result in reasonable inferences" and that "[a]n inference is not a supposition or a conjecture, but is a logical deduction from facts proved and guess work is not a substitute therefor" (alteration, internal quotation marks, and citations omitted)); *Muse v. Muse*, 2009-NMCA-003, ¶ 51, 145 N.M. 451, 200 P.3d 104 ("[A]rguments of counsel are not evidence.").

**{44}** In view of the foregoing, we affirm the district court's rulings granting summary judgment in favor of the Cross Country LLCs and Cross Country Members on their summary judgment motion and denying BUKE's motion for partial summary judgment premised on the same factual issue.

**2.    The District Court Properly Granted Summary Judgment Dismissing BUKE's**

13

**Unjust Enrichment Claim Against the Cross Country Members**

**{45}**    A plaintiff claiming unjust enrichment must show that "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 3 P.3d 695.

**{46}**    BUKE's unjust enrichment claim against the Cross Country Members is premised solely on the Members' receipt of profits and distributions from the Cross Country LLCs and BUKE's contention that Eastburg used BUKE's GM Badge and Credit Line without the requisite consent. BUKE does not contend and has not shown that the distributions themselves were wrongful. To the contrary, BUKE takes pains to point out that distributions to members are required by the Act, as they are by Section 3.2 of the Operating Agreement. Nor has BUKE shown that the Cross Country Members engaged in any unlawful conduct. According to BUKE, the Cross Country Members' "receipt of the benefits from the use of BUKE assets was unjust because Eastburg lacked the authority to use the [GM] credentials and GMAC credit line for the [Cross Country LLCs]."

**{47}**    The Cross Country Members have made numerous arguments in defense of the district court's ruling in their favor, citing law limiting the personal liability of LLC members for the debts and obligations of the company, including the protections provided in Section 53-19-13 ("No member or manager of a limited liability company . . . shall be obligated personally for any debt, obligation or liability of the limited liability company solely by reason of being a member or manager of the limited liability company[.]") and by the doctrine of "piercing the corporate veil," the requirements of which BUKE has conceded it cannot meet. We need not address the Cross Country Members' various arguments.

**{48}**    Given BUKE's stated basis for its unjust enrichment claim, the issue presented is resolved by our conclusion that the only reasonable inference to be drawn from the undisputed facts is that a majority of BUKE's members consented to Eastburg's use of BUKE's assets; that is, Eastburg's challenged use of BUKE's assets was not unauthorized, and any profits or distributions the Cross Country Members received from the Cross Country LLCs were not unjustly retained. The district court's entry of summary judgment dismissing the unjust enrichment claim was correct.

**C.**    **The District Court Properly Entered Summary Judgment Dismissing BUKE's Claims Against the Accountants**

**{49}**    BUKE contends that the district court erred when it granted summary judgment on its accountant malpractice claim because BUKE did not present expert testimony to support it. BUKE argues that the facts it presented on summary judgment demonstrate that Perner's alleged malpractice presents a conflict of interest so obvious that it falls within the common knowledge of lay jurors. We must address whether expert testimony is necessary to establish

an accountant malpractice claim based on an accountant's alleged conflict of interest.

**{50}**     Generally, a plaintiff must prove the following elements to prevail on a claim for professional malpractice based on negligence: "(1) the employment of the defendant [professional]; (2) the defendant [professional's] neglect of a reasonable duty; and (3) the negligence resulted in and was the proximate cause of loss to the plaintiff." *Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor*, 1993-NMCA-008, ¶ 9, 115 N.M. 159, 848 P.2d 1086. Professional malpractice based upon breach of duty concerns violations of a standard of conduct. *See Spencer v. Barber*, 2013-NMSC-010, ¶ 17, 299 P.3d 388. "Proof of the standard of conduct is necessary to maintain an action for malpractice." *Id.* The standard of conduct in a professional negligence case "is measured by the duty to apply the knowledge, care, and skill of reasonably well-qualified professionals practicing under similar circumstances." *Adobe Masters, Inc. v. Downey*, 1994-NMSC-101, ¶ 3, 118 N.M. 547, 883 P.2d 133.

**{51}**     Expert testimony is generally necessary to explain the applicable standard of conduct, and a plaintiff's failure to present expert testimony to support a professional malpractice claim is usually fatal. *See Cervantes v. Forbis*, 1964-NMSC-022, ¶ 12, 73 N.M. 445, 389 P.2d 210, *modified on other grounds by Pharmaseal Labs., Inc. v. Goffe*, 1977-NMSC-071, 90 N.M. 753, 568 P.2d 589; *First Nat'l Bank of Clovis v. Diane, Inc.*, 1985-NMCA-025, ¶ 24, 102 N.M. 548, 698 P.2d 5 ("To establish malpractice, testimony of another attorney as to the applicable standards of practicing attorneys is generally necessary."). "However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of [conduct] is not essential." *Pharmaseal Labs.*, 1977-NMSC-071, ¶ 17; *see Adobe Masters*, 1994-NMSC-101, ¶ 9 ("In professional negligence cases, both breach of the implied warranty to use reasonable skill under contract law and negligence resulting in a finding of malpractice must be proved by expert testimony *unless* the case is one where exceptional circumstances within the common experience or knowledge of a layman are present."); *Walters v. Hastings*, 1972-NMSC-054, ¶ 40, 84 N.M. 101, 500 P.2d 186 ("[C]ases may arise in which the asserted shortcomings of the attorney are such that they may be recognized or inferred from the common knowledge or experience of laymen.").

**{52}**     Under this exception, our courts have determined that expert testimony was not necessary in several medical malpractice cases that posed exceptional circumstances. For example, our courts did not require expert testimony in a case where a chiropractor fractured several of his patient's ribs while performing an adjustment, *Mascarenas v. Gonzales*, 1972-NMCA-062, ¶¶ 3, 13, 83 N.M. 749, 497 P.2d 751; where a physician jerked a tube from a patient's nose so forcefully it caused a balloon filled with mercury to rupture into the patient's lungs, *Pharmaseal Labs.*, 1977-NMSC-071, ¶¶ 6, 17-20; where a physician fractured his patient's femur inserting a metal pin during an operation then left the pin partially protruding from the bone into the soft tissue of the patient's leg, *Eis v. Chesnut*, 1981-NMCA-040, ¶¶ 3, 9-10, 96 N.M. 45, 627 P.2d 1244; or where a physician performed five breast implant operations on a patient, after which the implant was not even in "the

15

general vicinity" of where it should have been, *Toppino v. Herhahn*, 1983-NMSC-079, ¶¶ 7-8, 15, 100 N.M. 564, 673 P.2d 1297. In each of those cases, the appellate courts concluded it would not be unreasonable for a layperson to understand from the facts adduced that the defendant physicians may have committed professional negligence, a decision to be made by the fact finder or jury. Similarly, courts in other states have observed that expert testimony was not necessary to establish professional malpractice where an attorney missed deadlines or stole client funds, *Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1091 (D. Minn. 2001), or in cases where an attorney failed to appear in court on his client's behalf, notify a client of termination of employment, inform a client of a settlement offer, follow a client's instructions and adequately insulate it from creditors, or file an action within the statute of limitations, *Wastvedt v. Vaaler*, 430 N.W.2d 561, 565 (N.D. 1988).

{53}    We have not previously extended to accountant malpractice cases the principles we apply to physicians, attorneys, and architects concerning the necessity for expert testimony. However, the parties do not argue, and we do not see any reason why we should not do so now. *See, e.g.*, *Rino v. Mead*, 55 P.3d 13, 19 (Wyo. 2002); *Kemmerlin v. Wingate*, 261 S.E.2d 50, 51 (S.C. 1979) (noting that standard of care for accountants is the same as for doctors and other professionals, and since that area is beyond the realm of ordinary lay knowledge, expert testimony is usually necessary to establish the standard of care and the defendant's departure therefrom). Accordingly, we hold that the same principles that govern the necessity for expert testimony in other kinds of professional malpractice cases apply to accountant malpractice cases.

{54}    BUKE argues that it has presented undisputed evidence demonstrating that Perner's breach of the applicable standard of care is so obvious that an expert is not necessary in this case. BUKE asserts that "[l]oyalty and betrayal are not obscure concepts" and every person who has been "double-crossed" can understand the divided loyalties Perner faced. In particular, BUKE claims Perner breached his duty in two instances. First, BUKE argues that Perner should have declined to perform work for BUKE because he should have known that accepting the engagement would result in a conflict between BUKE's interests and those of the Cross Country LLCs. Second, BUKE contends that, during the August 2008 meeting with Branch and Perner, Perner should have voluntarily told Branch that cars listed on BUKE's inventory were on the Cross Country LLCs' lots, that several of those cars were not yet paid for, and that the Credit Line was "out of trust" and "subject to call," even though he had previously disclosed those facts in the RFS he provided to Eastburg on behalf of BUKE. BUKE concludes that we should infer from these facts that Perner faced a conflict of interest between BUKE and his "professional obligations" to the Cross Country LLCs, "which made it awkward, at a minimum, to disclose information to BUKE adverse to the interests of his pre-existing clients." BUKE further claims that Perner faced a conflict involving self-interest because Perner had become business partners with Eastburg and several of the Cross Country LLC Members in a new business venture and because Perner was to be paid $16,000 for the BUKE RFS and full disclosure to Branch might mean BUKE would terminate Perner's engagement. By not volunteering information to Branch at the August 2008 meeting, BUKE asserts that it is obvious that Perner "played" Branch and

16

protected the Cross Country LLCs, the Cross Country Members, and his own interests to the detriment of BUKE.

**{55}** In our view, this case does not present the type of exceptional circumstances that obviate the need for expert testimony. We note that, in general, expert testimony is necessary to establish a professional negligence claim based on an alleged conflict of interest. *See Meyer*, 156 F. Supp. 2d. at 1091 (holding that conflict of interest claims involve information that is not within the common knowledge of the jury); *see also Geiserman v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (holding that a malpractice claim premised on alleged conflict of interest or breach of fiduciary duty requires expert testimony); *Meller v. Bartlett*, 580 A.2d 484, 485 (Vt. 1990) (holding that lack of expert testimony was fatal to claims of conflict of interest, failure to account, and unauthorized hiring of another attorney). Here, Perner was hired to prepare tax returns and an RFS for BUKE, a car dealership owned by an LLC. At the time BUKE hired Perner to do its tax returns and RFS, Perner had previously prepared tax returns for the Cross Country LLCs. We do not believe that an average person would commonly know whether or how a conflict of interest might arise when an accountant prepares tax returns for similar businesses. An average person also would not know what information a reasonable accountant would discover in preparing a business's tax returns or RFS, whether a reasonable accountant in Perner's position would have necessarily discovered Eastburg's allegedly wrongful conduct in the scope of his work, whether a reasonable accountant should investigate any possible wrongdoing discovered within the course of the work to be performed, and what form any subsequent report of that investigation would take. To this end, an average person would not know whether a reasonably well-qualified accountant would verbally disclose in a meeting with a passive minority member of an LLC client the same items the accountant previously disclosed in a written RFS it provided to the LLC's managing member. Further, although this case is a conflict of interest case and BUKE does not question Perner's execution of specific accounting duties, the case is rife with questions related to the particular technical tasks involved in accounting, such as what an RFS is, how an accountant prepares an RFS or a business's tax returns, what a credit line is, and what it means if the credit line is "out of trust." None of these items falls under the common knowledge of an average person. In short, we conclude that this is precisely the kind of case in which expert testimony is necessary. *See, e.g.*, *Brown-Wilbert, Inc. v. Copeland Buhl & Co.*, 732 N.W.2d 209, 218 (Minn. 2007) (holding that, to survive a motion for directed verdict in an accountant malpractice case, a plaintiff must present expert testimony identifying the applicable standard of care and opine that the accountant deviated from that standard and that the departure caused the plaintiff's damages); *Gertler v. Sol Masch & Co.*, 835 N.Y.S.2d 178, 179 (App. Div. 2007) (upholding grant of directed verdict in accounting malpractice claim because there was no expert testimony to establish applicable standards of professional practice); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 185 (Tex. Ct. App. 1987) (emphasizing that expert testimony is usually necessary to establish the requisite standard of care and skill, a departure from that standard, and causation in an accountant malpractice case).

**{56}** To the extent BUKE relies on *Spencer* to support that it does not need expert testimony in this case, that argument is unavailing. In *Spencer*, our Supreme Court held that the Rules of Professional Conduct may be used to "illustrate the standard of conduct expected of a lawyer when confronted with a conflict of interest." 2013-NMSC-010, ¶ 18. Our Supreme Court determined that "although the Rules of Professional Conduct cannot be used as a basis for civil liability, the rules may be used to explain [a party's] professional obligations to [another.]" *Id.* ¶ 19. The issue that case addressed was "whether the duties a lawyer owes wrongful death statutory beneficiaries are governed, in whole or in part, by the Rules of Professional Conduct[.]" *Id.* ¶ 4 (alteration, internal quotation marks, and citation omitted). However, our Supreme Court in *Spencer* did not address whether expert testimony would ultimately be necessary to establish a professional malpractice claim based on an alleged conflict of interest. Rather, our Supreme Court explicitly noted that the question of whether a professional "conformed to the standard of conduct required by the Rules of Professional Conduct will depend on the evidence introduced at trial." *Id.* ¶ 19.

**{57}** Here, although citation to the applicable conflict of interest provisions of the code of professional conduct for accountants may help illustrate the standard of care for an accountant in a conflict of interest case, *see* 16.60.5.12 NMAC (01/01/2007), expert testimony is nevertheless required to inform the fact finder what is considered a conflict of interest under the code, and to resolve whether Perner's alleged actions violated it. *See, e.g.*, *Nw. Life Ins. Co. v. Rogers*, 573 N.E.2d 159, 163-64 (Ohio Ct. App. 1989) ("Because of the very nature and complexity of the Code of Professional Responsibility and the conduct of legal matters, expert testimony is required to support [malpractice] allegations except in those cases which are so patently obvious as to negate this requirement."); *cf. Lumbermens Mut. Cas. Co. v. Thornton*, 92 S.W.3d 259, 268 (Mo. Ct. App. 2002) (noting that, in accountant malpractice cases, the meaning of auditing standards and their application to the facts of the case is a question of fact to be determined with the aid of expert testimony).

**{58}** We hold that, in a professional malpractice case based on an accountant's purported conflict of interest, expert testimony is necessary to establish the applicable standard of conduct, unless exceptional circumstances make the alleged breach so obvious that it falls within the common knowledge of an average layperson. BUKE failed to prove that such exceptional circumstances exist. Because expert testimony was required to establish the applicable standards of conduct regarding an accountant's conflict of interest, and BUKE provided none, we affirm the district court's grant of summary judgment on the accountant malpractice claim.

**D.     The District Court Did Not Abuse Its Discretion in Denying BUKE's Motion to Amend the Scheduling Order**

**{59}** BUKE contends that the district court abused its discretion in denying its motion to amend the scheduling order to permit BUKE to designate an expert witness.

**{60}** The original complaint was filed in June 2009. In September 2010, the district court

entered a scheduling order setting a deadline of April 2011 for BUKE to file and serve its expert witness disclosure and setting a trial date in December 2011. BUKE moved to amend its complaint in December 2010, and filed it in February 2011, adding the Accountants as parties and asserting a claim against them for professional malpractice. Approximately two weeks after filing the amended complaint, BUKE filed a stipulated notice extending BUKE's expert witness disclosure deadline to May 2011. BUKE did not designate an accountant malpractice expert witness (or any expert witness) during that time or seek additional time to do so.

**{61}** The amendment of the complaint led to a series of recusals and peremptory challenges, and the case was finally assigned to a district judge in May 2011. BUKE deposed Perner in August 2011. BUKE claims that it first requested an additional extension of time to designate expert witnesses at a scheduling conference in September 2011, but the conference was unrecorded, and there is no evidence to support BUKE's contention.

**{62}** BUKE did not file a motion to modify the scheduling order until December 2011. The motion asserted that good cause existed to "conduct limited but necessary discovery, to file dispositive motions, and to prepare and file a pretrial order." The motion did not specifically request that the expert deadline be extended, although a proposed amended scheduling order, attached as an exhibit, provided an extended expert disclosure deadline. At a March 2012 hearing, the district court reset the trial date to July 2012 and granted additional time to conduct limited discovery. The court did not, however, extend the expert disclosure deadline, stating that it was "just too late" to do so. BUKE challenges that ruling. We review for an abuse of discretion, which "occurs when the [district] court's ruling is against the facts, logic, and circumstances of the case or is untenable or unjustified by reason." *Reaves*, 1999-NMCA-075, ¶ 13.

**{63}** "A scheduling order shall not be modified except by order of the court upon a showing of good cause." Rule 1-016(B) NMRA. "We will not interfere with the [district] court's enforcement of pretrial deadlines. Adherence to such scheduling orders [is] critical in maintaining the integrity of judicial proceedings." *Reaves*, 1999-NMCA-075, ¶ 28 (alteration, internal quotation marks, and citation omitted).

**{64}** We cannot say that the district court abused its discretion when it refused to amend the scheduling order to allow BUKE to designate an expert witness. BUKE filed its motion approximately ten months after it filed its claims against the Accountants, eight months after the original scheduling order deadline for designating witnesses, and seven months after the previously granted extension to that deadline had expired. The motion did not specifically request an extension on the expert disclosure deadline. Moreover, BUKE never identified any expert witness and does not say that it had actually retained an expert witness by the time the district court heard its motion, although it had to have known that it needed to have expert testimony to support the accountant malpractice claim asserted in the amended complaint. *See id.* ¶ 27.

19

**{65}** Accordingly, the district court did not abuse its discretion in denying BUKE's request to amend the scheduling order to allow it to designate an expert witness for its accounting malpractice claim.

## III. CONCLUSION

**{66}** For the reasons set forth above, we affirm the district court in all respects.

**{67}** **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Chief Judge**

_____
**JONATHAN B. SUTIN, Judge**