**Jennifer HORNER, Edna Mae Ahrens, Christopher Matthew Horner, and Ashley Renee Horner, Appellants,**

v.

**Anthony SPALITTO, Respondent.**

**No. WD 56282.**

Missouri Court of Appeals, Western District.

July 6, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1999.

Application for Transfer Denied Oct. 26, 1999.

John R. Campbell, Jr., William A. Mayer, Kansas City, for Appellant.

Ben T. Schmitt, Kansas City, for Respondent.

SPINDEN, Judge.

This case requires us to revisit the issue of what conduct is required of a pharmacist in fulfilling his professional duties. The pharmacist in this case, Peter Spalitto, was an employee and son of a pharmacy owner, Anthony Spalitto, and filled two prescriptions for Franklin Horner six days before Horner died of an apparent drug overdose. One of the prescriptions prescribed a strong hypnotic drug at a rate of three times the normal dose.

Horner's children and mother sued Anthony Spalitto for wrongfully causing Horner's death by acting through his employees and agents to fill prescriptions negligently at Spalitto's pharmacy in Kansas City. The circuit court granted summary judgment for Spalitto on the ground

that Peter Spalitto's only obligation was to fill the prescriptions accurately, which Horner's family concedes that he did. We reverse the summary judgment and remand this case to the circuit court for further proceedings.

Peter Spalitto was the pharmacist on duty at Anthony Spalitto's pharmacy on September 21, 1994, and filled two prescriptions presented by Horner. One of them was for 50, 750 mg. doses of Placidyl, a strong hypnotic drug. The prescribing physician instructed on the prescription that Horner was to take one dose every eight hours. The other was for 50, 10 mg. doses of Diazepam, a central nervous system depressant, and it instructed Horner to take one dose every eight hours. Before filling the prescriptions, Spalitto consulted *Facts and Comparisons,* an authoritative pharmacy manual, which indicated that the normal dose for Placidyl was one 500 mg. dose or one 750 mg. dose before bedtime. The manual also warned that the drug's effects were enhanced when it was combined with other central nervous system drugs, such as Diazepam. Concerned about the physician's ordering such a high dose of Placidyl, Peter Spalitto telephoned the prescribing doctor's office. He said that someone in the physician's office told him that the prescription was "okay" because Horner "needed to be sedated throughout the day."[1] Peter Spalitto filled the two prescriptions.

Six days later, on September 27, 1994, Franklin Horner was found dead. Bonita J. Peterson, M.D., opined after an autopsy "that [Horner's] death resulted from adverse effects of multiple medications (drugs), especially placidyl (ethchlorvynol), which was near the toxic range."

In their lawsuit, the Horner family contended that Spalitto, "through its[2] employees and agents," was negligent by:

a.) [F]illing the ... prescriptions for [Horner] when [Spalitto] knew or should have known, that, based on the nature of the drug, the dosage and instructions provided therewith, it would expose [Horner] to unreasonable risk of great bodily harm or death; and/or

. . . .

c.) [F]ailing to do any investigation whatsoever to ascertain whether or not [Horner] had a problem, or potential problem, with drug abuse or chemical dependence; and/or

d.) [F]ailing to question the fact that [Horner] was having two ... prescriptions for the same drug filled on the same day by [Spalitto]; and/or

e.) [P]roviding [Horner] a prescription with instructions to take it every eight ... hours when, in fact, such dosage far exceeds that recommended for this particular drug; and/or

f.) ... [Allowing Horner] to either take the prescription beyond the recommended daily dosage or [allowing Horner] to take the drug on a long-term basis when, in fact, it was recommended for only short-term [use] not to exceed one week; and/or

g.) [F]ailing to ascertain what other prescriptions or other drugs [Horner] was taking at the time; and/or

h.) [F]ailing to provide [Horner] any warning, either written or verbal, of the potential side-effects or adverse reactions to said drug or the dangers created by taking it in conjunction with other drugs or pharmaceuticals.

On December 19, 1997, Spalitto filed a motion for summary judgment contending that Horner's family had not alleged "that [Spalitto] breached its duty to [Horner] because it improperly filled a prescription or filled a prescription with apparent irregularities on its face." On July 22, 1998,

---

1. *Facts and Comparisons* indicates that a sedation dose is one 100 mg. to 200 mg. dose, no more than three times a day.

2. Although the lawsuit named Anthony Spalitto as the defendant, the petition phrased its action as though Spalitto's pharmacy was the defendant.

the circuit court granted Spalitto's motion for summary judgment, saying, "The court . . . finds and concludes based upon the ruling enunciated in *Kampe v. Howard Stark Professional Pharmacy, Inc.*[,] 841 S.W.2d 223 . . . (Mo.App.1992)[,] that [Spalitto] was under no duty to the [Horner family] and that the specific acts of alleged negligence stated in the pleadings are not sufficient to sustain a submission to a jury." In *Kampe*, this court said, "By properly filling legal prescriptions that contained no apparent discrepancies on their face, the pharmacy fulfilled its duty to appellant." *Id.* at 227.

■ In reviewing this judgment, we review the record in a light most favorable to, and give the benefit of all reasonable inferences in the record to, the party against whom judgment was entered. *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation,* 854 S.W.2d 371, 376 (Mo. banc 1993). Because summary judgment is "an extreme and drastic remedy," we exercise great caution in affirming a summary judgment because the procedure implicates the denial of due process by denying an opposing party his day in court. *Id.* at 377.

We reverse because *Kampe* caused the circuit court to apply the wrong standard. The *Kampe* court confused duty with what specific functions that duty obligates a pharmacist to do. *Kampe* ruled that a pharmacist fulfills his professional duties when he accurately fills a prescription— that he has no duty to warn or to monitor. This miscomprehended duty.

■ Duty is an obligation imposed by law to conform to a standard of conduct toward another to protect others against unreasonable, foreseeable risks. *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.,* 700 S.W.2d 426, 431 (Mo. banc 1985). " 'When the existence of a duty to use due care rests on a relationship between persons, the law has simply placed the actor under obligation for the benefit of another person—

the plaintiff—in the given circumstances.' " *Id.* at 432 (citation omitted). In other words, Anthony Spalitto's duty was to exercise the care and prudence that a reasonably careful and prudent pharmacist would exercise in the same or similar circumstances—that is, his duty was to endeavor to minimize the risks of harm to Horner and others which a reasonably careful and prudent pharmacist would foresee.

■ *Kampe* wrongly held that, as a matter of law, a pharmacist's duty will never extend beyond accurately filling a prescription. This may be a pharmacist's only duty in particular cases, but in other cases, a pharmacist's education and expertise will require that he or she do more to help protect their patrons from risks which pharmacists can reasonably foresee. We must leave to a fact-finder what this duty requires of a pharmacist in a particular case. We can say at this point only that a pharmacist, as is the case with every other professional, must exercise the care and prudence which a reasonably careful and prudent pharmacist would exercise.

To hold as *Kampe* did would denigrate the expertise which a pharmacist's education provides concerning drugs and their therapeutic use. The *Kampe* holding also failed to comprehend the role a pharmacist must play in making the valuable, but highly dangerous, service of drug therapy as safe and reliable as it can be.

The General Assembly recognized this role in § 338.010.1, RSMo 1994, in which it defined "the practice of pharmacy:"

[T]he interpretation and evaluation of prescription orders; the compounding, dispensing and labeling of drugs and devices pursuant to prescription orders; the participation in drug selection according to state law and participation in drug utilization reviews; the proper and safe storage of drugs and devices and the maintenance of proper records thereof; *consultation with patients and other health care practitioners about the safe and effective use of drugs and devices;* and the offering or performing of

those acts, services, operations, or transactions necessary in the conduct, operation, management and control of a pharmacy.[3]

In 1990, the federal government enacted the Omnibus Budget Reconciliation Act which required states to establish standards for pharmacist counseling of pharmacy customers or their caregivers. In fulfillment of that mandate, the Board of Pharmacy promulgated a regulation, 4 C.S.R. 220–2.190, which says:

(1) Upon receipt of a prescription drug order and following review of the available patient information, a pharmacist or his/her designee shall personally offer to discuss matters which will enhance or optimize drug therapy with each patient or caregiver of each patient. Counseling shall be conducted by the pharmacist or pharmacy extern under the pharmacist's immediate supervision to allow the patient to safely and appropriately utilize the medication so that maximum therapeutic outcomes can be obtained.... The elements of counseling shall include matters which the pharmacist deems significant in the exercise of his/her professional judgment and is consistent with applicable state laws.

(2) Pharmacies shall maintain appropriate patient information to facilitate counseling. This may include, but shall not be limited to, the patient's name, address, telephone number, age, gender, clinical information, disease states, allergies and a listing of other drugs prescribed.

Under this regulation, a pharmacist is obligated to offer to discuss with each customer or their caregiver information about the safe and appropriate use of the medication based on the pharmacist's review of available patient information.

The General Assembly included pharmacists as health care workers covered by statutes capping the liability of health care workers in professional malpractice actions. Section 538.205(4), RSMo 1994, defines a "health care provider:"

[A]ny physician, hospital, ambulatory surgical center, long-term care facility, dentist, registered or licensed practical nurse, optometrist, podiatrist, *pharmacist*, chiropractor, professional physical therapist, psychologist, physician-in-training, and any other person or entity that provides health care services under the authority of a license or certificate.[4]

"Health care services" include "any services that a health care provider renders to a patient in the ordinary course of the health care provider's profession[.]" Section 538.205(5), RSMo 1994. The chapter applies to "any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services." Section 538.210.1, RSMo 1994. Section 538.225.1, RSMo 1994, in effect, sets the pharmacist's duty by mandating that his action or omission be judged by his peers according to what "a reasonably prudent and careful health care provider would have [done] under similar circumstances[.]"

Pharmacists have the training and skills to recognize when a prescription dose is outside a normal range. They are in the best position to contact the prescribing physician, to alert the physician about the dose and any contraindications relating to other prescriptions the customer may be taking as identified by the pharmacy records, and to verify that the physician intended such a dose for a particular patient. We do not perceive that this type of risk management unduly interferes with the physician-patient relationship.[5] Instead, it should increase the overall quality of health care. *See* KENNETH R. BAKER, *The OBRA 90 Mandate and Its Developing Impact on the Pharmacist's Standard of*

---

3. We added the emphasis.

4. We added the emphasis.

5. Spalitto relies on *McKee v. American Home Products, Corp.*, 113 Wash.2d 701, 782 P.2d 1045, 1055–56 (1989), in which the Supreme Court of Washington decided that, because of

*Care,* 44 DRAKE L.REV. 503, 517 (1996). The physician still is responsible for assessing what medication is appropriate for a patient's condition, but the pharmacist may be in the best position to determine how the medication should be taken to maximize the therapeutic benefit to that patient, to communicate that information to the customer or his physician, and to answer any of the customer's questions regarding consumption of the medication. *Id.*

Relegating a pharmacist to the role of order filler, as the *Kampe* court seemed to do, fails to appreciate the role recognized in § 338.010 and 4 C.S.R. 220–2.190. We reject the suggestion in *Kampe* that the only functions which a pharmacist must perform to fulfill his duty is to dispense drugs according to a physician's prescription.

▋ We do not have in the record presented to us sufficient detail to determine whether Peter Spalitto fulfilled his duty as a pharmacist. We know that he consulted with someone in the prescribing physician's office, but we do not know with certainty whether Spalitto articulated to the prescribing physician that he was prescribing Placydil at a significantly higher dose than the recommended dose for sedation. Did he inform the physician that the simultaneous prescription of Diazepam exacerbated the unusually heavy dose of Placydil? Could a jury have concluded that Peter Spalitto, given his education and

the potential for interference with the physician-patient relationship, a pharmacist does not "have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side effects associated with a drug[.]" The court reasoned that, without benefit of the patient's medical history and knowledge of the patient's medical conditions, a pharmacist was not qualified to determine the propriety of a particular patient's drug regimen and such would amount to the unauthorized practice of medicine. The court concluded that requiring a pharmacist to warn would result in second-guessing prescriptions and would "likely create antagonistic relations between pharmacists and physicians." *Id.* at 1053. We agree that a physician typically is in a

knowledge, should have, in fulfillment of his duty to Horner, done more to inform the physician and Horner of the dangers presented by such a high dose? We do not know from this record. The circuit court did not have a sufficient record to support its summary judgment. Hence, we reverse the circuit court's summary judgment. We remand the case for further proceedings.

EDWIN H. SMITH, Presiding Judge, and FOREST W. HANNA, Judge, concur.

superior position to judge the propriety of a particular patient's drug regimen, but this should not relegate the pharmacist to the role of being merely an order filler. This view does not recognize, as § 338.010.1 does that the practice of pharmacy includes consulting with physicians and patients to share with them the pharmacist's expertise in drugs and their interactions. We disagree that a pharmacist's consulting with a physician about an unusual prescription would result in antagonism exceeding the potential public benefit. Pharmacists are trained to recognize proper dose and contraindications of prescriptions, and physicians and patients should welcome their insights to help make the dangers of drug therapy safer.