# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: April 13, 2017

**NO. 34,914**

**KATHLEEN M. OAKEY, Personal Representative
of the Estate of TAWANA LUCERO, deceased,**

  Plaintiff-Appellant,

v.

**MAY MAPLE PHARMACY, INC.,**

  Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
C. Shannon Bacon, District Judge**

Fine Law Firm
Mark Fine
Albuquerque, NM

Fuqua Law & Policy, P.C.
Scott Fuqua
Santa Fe, NM

for Appellant

Hatcher Law Group, P.A.
Scott P. Hatcher
Mark A. Cox
Santa Fe, NM

for Appellee

**OPINION**

**VANZI, Chief Judge.**

{1}     This appeal arises from a lawsuit brought by the personal representative of the estate of Tawana Lucero, who died at the age of nineteen from an overdose of physician-prescribed medications, including opioids classified under federal and state law as Schedule II controlled substances because of their high potential for abuse and addiction. As relevant here, the personal representative (Plaintiff) asserts claims of negligence and negligence per se against May Maple Pharmacy, Inc. (the Pharmacy). The Pharmacy moved for summary judgment, contending that it was entitled to judgment as a matter of law because "a pharmacist's standard of care is to dispense appropriately prescribed medications to a patient in accordance with a proper medical doctor's prescription[,]" and the Pharmacy met that standard in filling the prescriptions at issue. The district court entered an order granting the motion, dismissing all claims against the Pharmacy with prejudice, and awarding costs to the Pharmacy. We reverse.

**FACTUAL BACKGROUND**

{2}     The record reveals the following undisputed facts. On December 1, 2009, Lucero died from multiple drug toxicity. The autopsy report identified the drugs in her system as Oxycodone, Oxymorphone, and Alprazolam. At the time of her death,

Lucero's Oxycodone levels were 980 ng/mL; her Oxymorphone[1] levels were 26 ng/mL; and her Alprazolam levels were 95 ng/mL.[2]

{3}    As described in the toxicology report, Oxycodone is a "semi-synthetic narcotic analgesic" used to control pain. It has an "addiction liability" similar to that of morphine and should be administered in the smallest dose possible and as infrequently as possible; the usual adult dose is 5 mg every six hours. Oxycontin is an extended-release form of Oxycodone. It can cause adverse reactions, including death, at concentrations well less than 1000 ng/mL, especially when taken in combination with other central nervous system (CNS) depressants. Opioids have a high potential for abuse and addiction and are classified as Schedule II controlled substances under federal and state law. 21 U.S.C. § 812(b)(2), (Schedule II)(a)(1) (2012); 21 C.F.R. § 1308.12(b)(1); NMSA 1978, § 30-31-5(B) (1972); NMSA 1978, § 30-31-7(A)(1)(a), (A)(2)(p) (2007); 16.19.20.66(A)(1)(n) NMAC. Alprazolam is a benzodiazepine with CNS depressant effects used to manage anxiety and related disorders. The recommended dosage is 0.8 to 4 mg for anxiety, and 6 to 9 mg for phobic and panic disorders. When used in conjunction with other CNS depressants,

---

[1]Oxymorphone is an opioid analgesic used to treat pain, and a pharmacologically active metabolite of Oxycodone, with adverse effects typical of opioids. It is also classified as a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12(b)(1) (2016).

[2]"ng" means nanogram; "mL" means milliter; "mg" means milligram.

2

Alprazolam can be toxic even at low concentrations. Alprazolam has a lower potential for abuse than Oxycodone and is classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14(c)(2) (2015); § 30-31-5(D); 16.19.20.68(A)(2) NMAC.

{4}     Dr. John Tyson of Doctor On Call, LLC, a medical clinic focusing on pain management, wrote prescriptions for Oxycodone, Oxycontin, and Alprazolam to treat Lucero's pain and anxiety, which the Pharmacy dispensed to Lucero from May 28, 2009 through November 16, 2009. Oxycodone was prescribed in 5 mg dosages, and Oxycontin was prescribed in dosages between 20 mg and 80 mg. The Pharmacy sometimes dispensed medication to Lucero "early," i.e., prior to the time the previously prescribed amount should have lasted if taken as directed.

{5}     The Pharmacy does not dispute Plaintiff's interpretation of the record as showing that the Pharmacy filled Oxycontin prescriptions for Lucero between two and twenty-three days "early" on at least seven occasions between May 28, 2009 and September 21, 2009. At least some of these prescriptions contained the words "OK to fill early" or a similar indication that the prescription could be filled "early." On a few occasions, Lucero paid a substantial amount of cash to purchase Oxycontin from the Pharmacy, and at least once paid $1,107 for 90 Oxycontin 80 mg pills in September 2009. An October 2009 "addendum" note by Doctor on Call's Dr. Maron with the subject "Rx FRAUD?" indicates receipt of a call from an unidentified

pharmacist reporting that Lucero had "presented to pharmacy for early refill" and had offered to pay over $1000 cash, despite that she would have received the medication free via Medicaid three days later.

**PROCEDURAL BACKGROUND**

{6}     Plaintiff initially sued Dr. Tyson and Doctor On Call, asserting claims for malpractice, negligence, and wrongful death (among others), based on allegations that Dr. Tyson had prescribed excessive amounts of dangerous medications to Lucero. A subsequent amended complaint also asserted claims against the Pharmacy, as follows: (1) negligence, based on allegations that the Pharmacy breached its "duty of care to apply the knowledge ordinarily used by reasonably well-qualified pharmacists" by dispensing "excessive quantities of Schedule II or other dangerous drugs" to Lucero; and (2) negligence per se, based on allegations that the Pharmacy, by dispensing "excessive quantities of medications" to Lucero "departed from the standard of care, knowledge, and skill of a reasonably trained pharmacist" and breached regulatory duties to "properly and reasonably dispense controlled medications" mandated by 16.19.20.41(A) NMAC and 16.19.4.16 NMAC.

{7}     The Pharmacy moved for summary judgment, dismissal with prejudice, and costs, based on the argument that "[a] pharmacist who accurately fills prescription medication as prescribed by the doctor has no liability exposure to one who is injured

4

by the drugs on claims the amounts were excessive, unless the pharmacist has some reason to know the specific customer will be harmed[,]" and that the Pharmacy "accurately dispensed what . . . Lucero's doctors prescribed and otherwise met all applicable standards of care." The Pharmacy's motion discussed no standard other than its proffered clerical accuracy standard, for which it relied on case law from other jurisdictions. The motion made no mention of any statutes or regulations applicable to pharmacy practice or controlled substances and no argument concerning Plaintiff's claim of negligence per se, nor did the Pharmacy's reply brief,[3] although Plaintiff addressed these points in opposing the motion. Plaintiff argued that genuine issues of material fact precluded summary judgment because the parties' experts gave contrary opinions concerning the conduct required of a retail pharmacist in these circumstances, pursuant to statutes, regulations, and public policy, and whether the Pharmacy's conduct deviated from the standard of care.

[3]The reply brief was accompanied by a supplemental expert affidavit, which asserted that the affidavit of Plaintiff's expert did not substantiate a violation of the federal Controlled Substances Act or New Mexico's Pharmacy Act or Administrative Code. The reply brief, however, made no such argument. We do not consider the supplemental affidavit, as the motion itself must establish a prima facie case of entitlement to summary judgment. *See, e.g.*, *Brown v. Taylor*, 1995-NMSC-050, ¶¶ 8, 15, 120 N.M. 302, 901 P.2d 720 (stating that the party moving for summary judgment bears "the burden of showing the absence of any genuine issue of material fact, and also that the undisputed facts supported judgment in its favor as a matter of law" and that "until the moving party has made a prima facie case that it is entitled to summary judgment, the non-moving party is not required to make any showing with regard to factual issues" (internal quotation marks and citation omitted)).

5

{8} The parties' expert affidavits reflect differing opinions concerning the standard of care for retail pharmacists dispensing Schedule II drugs and whether the Pharmacy's conduct met that standard. The Pharmacy's expert, Dr. Matthew C. Lee, stated that "[t]he appropriate standard of care for a retail pharmacist is that he or she has a duty to dispense appropriately prescribed medications to a patient" and that if the pharmacist "does not dispense medication in accordance with the medical doctor's prescription, that pharmacist risks interfering with the doctor/patient relationship and may be inappropriately practicing medicine without a license." According to Dr. Lee, there were instances in this case "where the customer presented with an early refill" but Dr. Tyson had approved "those early refills for reasons medically indicated by the doctor[,]" and physician-approved "early refills" are valid and should be filled by the pharmacist.

{9} Dr. Lee stated that, "[i]f the retail pharmacist does find discrepancies in either the prescriptions ordered or in fact has evidence of drug abuse, the pharmacist should call the prescribing physician to ensure that the prescriptions presented are in fact what the physician intended to order[,]" noting but not identifying "certain indications in the record" that the Pharmacy "did consult with personnel at Doctor[]on[]Call[.]" Dr. Lee added,

> [T]here is nothing unusual or inappropriate about either the level or
> amount of narcotic medication prescribed which should have led any

6

retail pharmacist to question or refuse to dispense the prescription. Although the dosages are considered high, specifically for Oxycontin, there is nothing unusual in this dosage level as prescribed for patients with chronic pain. In other words, all prescriptions of Dr. Tyson and filled at the May Maple Pharmacy are valid and legitimate.

{10} Dr. Lee's affidavit did not explain the basis for his opinions or identify any source materials supporting them, other than his background in pharmacy and his review of certain case documents, including prescriptions, medical records, and deposition transcripts of the medical examiner and a state police officer. Although he cited no authorities—legal or professional—Dr. Lee said he "found no violation of any federal or New Mexico statutory or regulatory requirements dealing with the practice of pharmacy[,]" and concluded without further explanation that the Pharmacy "accurately filled all prescriptions according to the terms and instructions written by Dr. Tyson" and "met all applicable standards of care which apply to the practice of retail pharmacy."

{11} Plaintiff's expert, Dr. James T. O'Donnell, relied on his background in pharmacy and review of record materials but also on his review of other materials, including the Standards of Practice for the Profession of Pharmacy, the New Mexico Pharmacy Practice Act, provisions of the federal Controlled Substances Act, and materials addressing the responsibilities of pharmacists under the Controlled Substances Act. Dr. O'Donnell disagreed with Dr. Lee's opinions that the

7

prescriptions at issue were facially valid and that the standard of care for retail pharmacists required nothing more of the Pharmacy in these circumstances than that it accurately fill facially valid prescriptions. He said that prescriptions indicating "OK to fill early" were illegal and could not be filled "no matter what the prescriber has written on the prescription" because they were for Schedule II controlled substances, which cannot be "refilled"[5] or authorized as "OK to fill early." According to Dr. O'Donnell, a pharmacist faced with an "early" request to fill a prescription for a Schedule II controlled substance "has a duty to inquire [of] the patient why, and then speak to the physician and get authorization from the physician."

{12} Dr. O'Donnell said that such "early" requests are "evidence of excessive use of the [c]ontrolled [s]ubstance, in excess of the prescribed dose." Excess use "places the patient at risk ([of] death or serious injury), increases abuse, dependence, and addiction, and may be evidence of diversion." A pattern of such "early" requests "is highly suspicious of abuse and[/]or diversion, and would preclude the pharmacist"

---

[5] The Pharmacy and the district court criticized Dr. O'Donnell's use of the term "refill." But Dr. Lee used that term in his affidavit, and Dr. O'Donnell responded that Schedule II controlled substances may not be "refilled." *See* NMSA 1978, § 30-31-18(A) (2005); 16.19.20.43 NMAC. We note that the Administrative Code uses the term "early refill" in listing indicators of "potential abuse or misuse of opioids," despite that opioids are Schedule II controlled substances. *See* 16.19.4.16(E)(1)(a) NMAC. In any event, we do not understand the issue in this case to turn on the difference between a "refill" and a request to fill a new prescription "early," i.e., prior to the time the previously prescribed amount should have lasted if taken as directed.

from filling the prescriptions; to do otherwise would violate requirements of "[g]ood [f]aith, [r]easonable [j]udgment, and [c]orresponding [r]esponsibility" imposed by federal and state law. According to Dr. O'Donnell, provisions of the federal Controlled Substances Act, the New Mexico Pharmacy Act, and their respective implementing regulations "require the pharmacist to consider issues beyond the face legality of the prescription" such as abuse, diversion, and whether the prescription is for a legitimate medical need. He concluded that the Pharmacy breached the "[s]tandard of [c]are of the [p]rofession of [p]harmacy" and violated the New Mexico Pharmacy Practice Act, NMSA 1978, § 61-11-1 (1997); 16.19.20.41 NMAC; and the federal and state Controlled Substances Acts, 21 U.S.C. § 829 (2016); 21 C.F.R. § 1306.04(a) (2017); and NMSA 1978, § 30-31-1 (2005).

{13}    At the motion hearing, the district court responded to Plaintiff's observation that no New Mexico case prescribes a standard of care for pharmacists in this circumstance by stating that "there is a standard. It's called the reasonably prudent pharmacist." The court focused heavily on Dr. O'Donnell's opinion that prescriptions indicating "OK to fill early" were illegal because they were for Schedule II controlled substances, which cannot be "refilled" or authorized as "OK to fill early," inquiring what law supports that opinion, and stating that Dr. O'Donnell's affidavit "needed to be clear on its face" but fell "woefully short" and did not "set forth a standard of

9

care." In the district court's view, "Dr. O'Donnell needed to take on Dr. Lee in order to create that genuine issue of material fact" and failed to do so.

{14} The district court entered an order dismissing the Pharmacy from the lawsuit and awarding costs to the Pharmacy, stating without further elaboration that there were no issues of material fact and that the Pharmacy was entitled to summary judgment as a matter of law. This appeal followed.

**STANDARD OF REVIEW**

{15} Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Rule 1-056(C) NMRA. "An issue of fact is 'material' if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute." *Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 6, 145 N.M. 179, 195 P.3d 24. The motion must present "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted). If it does, the opposing party "must adduce evidence to justify a trial on the issues." *Id.* (internal quotation marks and citation omitted). Nevertheless, "[t]he mere fact that the non-moving party has failed to contravene the assertions of the material supporting a motion for summary judgment

10

does not mean that the moving party is entitled to judgment. The moving party may not be entitled to judgment even if the non-moving party totally fails to respond to the motion." *Brown*, 1995-NMSC-050, ¶ 8. This is because "the non-moving party is not required to make any showing with regard to factual issues" unless "the moving party has made a prima facie case that it is entitled to summary judgment[.]" *Id.* (internal quotation marks and citation omitted). "If there is the slightest doubt as to the existence of material factual issues, summary judgment should be denied." *Garcia-Montoya v. State Treasurer's Office*, 2001-NMSC-003, ¶ 7, 130 N.M. 25, 16 P.3d 1084 (internal quotation marks and citation omitted).

{16}     We apply a de novo standard of review, pursuant to which we employ the same standard the district court is required to apply on summary judgment, i.e., we "view the facts in a light most favorable to the party opposing summary judgment and draw all reasonable inferences in support of a trial on the merits." *Romero*, 2010-NMSC-035, ¶ 7 (internal quotation marks and citation omitted); *see Thompson v. Potter*, 2012-NMCA-014, ¶ 7, 268 P.3d 57 ("On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute." (internal quotation marks and citation omitted)).

**DISCUSSION**

{17}     The district court's order granting summary judgment contains no analysis but necessarily reflects the court's conclusion that Dr. Lee's affidavit sufficed to satisfy the Pharmacy's burden to establish a prima facie case of entitlement to judgment as a matter of law as to the applicable standard of care, the Pharmacy's compliance with the standard, and the court's rejection of Plaintiff's argument that the differing opinions of the parties' experts demonstrated the existence of a genuine dispute of material fact on those issues. In addition, the district court's dismissal of the Pharmacy "from this suit[] with prejudice" necessarily reflects the dismissal of all claims against the Pharmacy—the negligence claim and the separate claim for negligence per se.

{18}     We reverse, based on our conclusions that (1) the Pharmacy's motion did not establish a prima facie case of entitlement to judgment as a matter of law as to the standard of care or the Pharmacy's compliance with the standard; (2) even if the Pharmacy had met that burden, Plaintiff's expert affidavit sufficed to establish a genuine dispute of material fact concerning these material issues; and (3) dismissal of the Pharmacy from the case was improper because the motion did not demonstrate

12

the Pharmacy's entitlement to summary judgment on the separate claim of negligence per se, and there is no indication that the district court even considered that issue.[6]

{19}     This case involves a question of first impression in New Mexico: the conduct required of retail pharmacists in filling prescriptions for controlled substances with a significant potential for abuse and addiction, such as Oxycodone and Oxycontin. The few New Mexico negligence cases involving the conduct of pharmacists provide no guidance. *See, e.g.*, *Johnson v. Primm*, 1964-NMSC-217, ¶¶ 6, 15-16, 74 N.M. 597, 396 P.2d 426 (reversing summary judgment in favor of the pharmacy in a case alleging that the pharmacy failed to exercise due care in selling the plaintiff a drug in excess of the prescribed amount based on consideration of contributory negligence and proximate cause without addressing the standard of care); *Wilcox v. Butt's Drug Stores, Inc.*, 1934-NMSC-060, ¶ 12, 38 N.M. 502, 35 P.2d 978 (affirming judgment against a pharmacy in a case in which the plaintiff sought damages for the death of her dog from a dangerous drug, applying the "controlling" principle that "[a] druggist

---

[6]We reject the Pharmacy's contention that Plaintiff waived the improper-dismissal argument by failing to raise the issue in the docketing statement and violated Rule 12-208 NMRA by including this argument in the brief in chief. *See* Rule 12-213(A)(1) NMRA (current version at Rule 12-318(A)(1) NMRA) (stating that appellant's brief in chief "may raise issues in addition to those raised in the docketing statement . . . unless the appellee would be prejudiced"); *State v. Salgado*, 1991-NMCA-044, ¶ 3, 112 N.M. 537, 817 P.2d 730 (stating that, for cases assigned to the general calendar, "we can consider any evidence in the record on appeal even if not noted in the docketing statement"). The Pharmacy claims no prejudice, nor is any prejudice apparent.

who negligently delivers a deleterious drug when a harmless one is called for is responsible to the customer for the consequences, as being guilty of a breach of the duty which the law imposes on him to avoid acts in their nature dangerous to the lives of others" (internal quotation marks and citation omitted)); *Thompson*, 2012-NMCA-014, ¶¶ 19-23 (declining to reach question of a consulting pharmacist's duty to patients of nursing facility).

{20} We recognize the importance of this question, especially in light of the nation's ongoing "opioid crisis," the subject of news reports and commentary almost daily. But the factual record and the law potentially relevant to this determination were not adequately developed below, nor did the district court actually rule on the issue,[7] leaving us with an insufficient basis for appellate review. Accordingly, we reverse and remand for these reasons as well. *See Garcia-Montoya*, 2001-NMSC-003, ¶ 48 (remanding for district court to consider an issue in the first instance and, if necessary, to develop additional facts); *Brown*, 1995-NMSC-050, ¶ 15 (stating that summary judgment is inappropriate "when the facts before the court are insufficiently

[7]We do not regard the district court's statement at the motion hearing that "there is a standard . . . called the reasonably prudent pharmacist" as a ruling resolving the questions of the conduct required of retail pharmacists in these circumstances and whether the Pharmacy's conduct complied with that standard as a matter of law. As we discuss further, the Pharmacy does not dispute the existence of a duty to conform its conduct to that of a reasonably prudent pharmacist. At issue is the specific conduct required in these circumstances and whether the Pharmacy's conduct met those requirements.

developed or where further factual resolution is essential for determination of the central legal issues involved" (internal quotation marks and citation omitted)); *Horner v. Spalitto*, 1 S.W.3d 519, 524 (Mo. Ct. App. 1999) (reversing summary judgment where the appellate court did not have "in the record presented . . . sufficient detail to determine whether [the defendant] fulfilled his duty as a pharmacist").

**A.       The Substantive Legal Framework: Negligence and Negligence Per Se**

{21}    To prevail on a negligence claim, a plaintiff must prove "the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Spencer v. Health Force, Inc.*, 2005-NMSC-002, ¶ 18, 137 N.M. 64, 107 P.3d 504 (internal quotation marks and citation omitted). To support a claim for negligence per se (distinct from a negligence claim), "the regulation or statute at issue must specify a duty that is distinguishable from the ordinary standard of care[,]" rather than "impose general duties[.]" *Thompson*, 2012-NMCA-014, ¶¶ 32-33; *see Heath v. La Mariana Apartments*, 2008-NMSC-017, ¶ 21, 143 N.M. 657, 180 P.3d 664 (explaining that, to support a claim for negligence per se, a statute or regulation must "contain a specific standard of care that does not merely repeat the common law standard"). "Duty" and the "standard of care" are

separate and distinct concepts. The difference may not always be clear in the case law, in part, because courts address the issues as they are framed by the facts of the particular case and by the arguments of the parties.

{22} "Duty" is a requirement imposed by law to conform one's conduct to a certain "standard of care." *See Calkins v. Cox Estates*, 1990-NMSC-044, ¶ 8 n.1, 110 N.M. 59, 792 P.2d 36 (discussing "duty" as defining "the legal obligations of one party toward another"). The existence of a duty is a question of policy to be determined by the court as a matter of law "with reference to legal precedent, statutes, and other principles comprising the law." *Id.* ¶ 8 (citing W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 37 (5th ed. 1984) (Prosser & Keeton)); *see Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 2014-NMSC-014, ¶ 19, 326 P.3d 465 (noting that "courts should focus on policy considerations when determining the scope or existence of a duty of care"); *Tafoya v. Rael*, 2008-NMSC-057, ¶ 14, 145 N.M. 4, 193 P.3d 551 ("It is well established that the existence of a tort duty in a given situation is a question of policy to be answered by reference to legal precedent, statutes, and other principles of law." (internal quotation marks and citation omitted)); *Lester ex rel. Mavrogenis v. Hall*, 1998-NMSC-047, ¶ 10, 126 N.M. 404, 970 P.2d 590 (stating that "[p]olicy determines duty" (internal quotation marks and citations omitted)).

{23}    Where a "duty" exists, it generally requires that the defendant's conduct conform to the same standard of care—that of a reasonable person under the same or similar circumstances, usually referred to as the "ordinary care" standard. *See* Prosser & Keeton, *supra*, § 37[4] at 236; *see also Calkins*, 1990-NMSC-044, ¶ 11 ("New Mexico law recognizes that there exists a duty assigned to all individuals requiring them to act reasonably under the circumstances according to the standard of conduct imposed upon them by the circumstances."); UJI 13-1604 NMRA ("Every person has a duty to exercise ordinary care for the safety of the person and the property of others."); UJI 13-1603 NMRA (instructing that " '[o]rdinary care' is that care which a reasonably prudent person would use in the conduct of the person's own affairs"; "[w]hat constitutes 'ordinary care' varies with the nature of what is being done"; "[a]s the risk of danger that should reasonably be foreseen increases, the amount of care required also increases" and that, "[i]n deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances").

{24}    In contrast to the question whether the defendant has a legal duty, determined by the court as a matter of law, questions concerning whether the defendant has exercised proper care in the performance of a legal duty are factual issues. *See Rodriguez*, 2014-NMSC-014, ¶ 15 (explaining that "a court's concern that the

plaintiffs are seeking a broader standard of care is a concern about whether the plaintiffs expect too much of the defendants—something more than what is reasonable—which is relevant to the issue of breach of duty, not whether a duty is owed, and breach of duty questions are usually reserved for the jury"); *Crouch v. Most*, 1967-NMSC-216, ¶ 16, 78 N.M. 406, 432 P.2d 250 ("[T]he question of whether or not [the] appellee's treatment was within an accepted medical standard was a factual question requiring special scientific knowledge that could best be answered by the expert witnesses."); *Lasley v. Shrake's Country Club Pharm., Inc.*, 880 P.2d 1129, 1132 (Ariz. Ct. App. 1994) (explaining, in a case against a pharmacy, that "[s]pecific details of conduct do not determine whether a duty exists but instead bear on whether a defendant who owed a duty to the plaintiff breached the applicable standard of care" and that "whether the defendant's conduct met the standard of care is a question for the trier of fact" in most cases); *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 519 (Ind. 1994) (stating in a pharmacy case that "[w]hat constitutes due care in a particular case will depend upon the circumstances of that case, and will usually be a question of fact"); *Horner*, 1 S.W.3d at 522 (stating that a pharmacist "must exercise the care and prudence which a reasonably careful and prudent pharmacist would exercise" and that the fact-finder must determine what this requires in a particular case); *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990)

18

(explaining in a pharmacy case that duty "raises the question of whether the defendant is under any obligation required by law for the benefit of the particular plaintiff[,]" and that "once a duty is established, the scope of the duty or the standard of care is a question of fact to be decided by the trier of fact").

{25}     Where the defendant is a professional, the duty imposed by law is not the requirement to exercise "ordinary care" under the same or similar circumstances but "to apply the knowledge, care, and skill of reasonably well-qualified professionals practicing under similar circumstances." *Buke, LLC v. Cross Country Auto Sales, LLC*, 2014-NMCA-078, ¶ 50, 331 P.3d 942 (internal quotation marks and citation omitted); *see* UJI 13-1101 NMRA (instructing that health care providers are "under the duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified [health care providers] practicing under similar circumstances"); *Lasley*, 880 P.2d at 1132-33 (applying this standard to pharmacists); *Oleckna v. Daytona Discount Pharmacy*, 162 So. 3d 178, 181 (Fla. Dist. Ct. App. 2015) (same); *Hooks SuperX, Inc.*, 642 N.E.2d at 519 (same); *Horner*, 1 S.W.3d at 522 (same); *Dooley*, 805 S.W.2d at 385 (same). The professional standard of care generally must be established by expert testimony. *See Crouch*, 1967-NMSC-216, ¶ 16; *Buke*, 2014-NMCA-078, ¶ 51; UJI 13-1101 (instructing that the only way to decide whether a health care provider met the professional standard is from expert

19

witnesses); Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 12, cmt. a (2010) (stating that "[i]f an actor has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person" and that these skills and knowledge "provide a mere circumstance for the jury to consider in determining whether the actor has complied with the general standard of reasonable care").

{26} Notwithstanding that inquiries concerning whether a professional has exercised the proper care in the performance of a legal duty are largely fact-specific, *see, e.g.,* *Rodriguez*, 2014-NMSC-014, ¶ 15, statutes, regulations, and court rules imposing requirements on professionals are relevant to the determination of the standard of care required by the circumstances and whether it has been met, even if they do not necessarily suffice to establish a standard of care or provide a cause of action for their violation. *See, e.g.*, *Spencer v. Barber*, 2013-NMSC-010, ¶¶ 14-19, 299 P.3d 388 (holding that the New Mexico Rules of Professional Conduct are relevant to establish the appropriate standard of conduct for attorneys and that the determination of whether or not the defendant attorney conformed to the standard of conduct required by those rules "will depend on the evidence introduced at trial" and concluding, *inter alia*, that genuine issues of material fact existed concerning whether the defendant

attorney failed to exercise reasonable skill and care in his representation of client); *Oleckna*, 162 So. 3d at 183 n.4 (stating that Florida pharmaceutical regulatory statutes and administrative codes do not create private cause of action but "do describe the duties of Florida pharmacists").

{27} Thus, where statutes, regulations, and/or court rules apply to the conduct of a professional, they should be considered in determining whether the professional fulfilled the duty imposed by the common law to conform his or her conduct to the standard of care required in the circumstances, *see Spencer*, 2013-NMSC-010, ¶¶ 14-19, and expert testimony purporting to address the professional standard of care and whether it was met must account for them.

**B.     The Pharmacy Did Not Establish a Prima Facie Case of Entitlement to Judgment as a Matter of Law on Either Negligence or Negligence Per Se**

**1.     The Issue Presented Is Compliance With the Standard of Care**

{28} The parties in this case appear to use the terms "duty" and "standard of care" as if they were interchangeable. Nevertheless, as we understand their arguments, the issue is not whether the law imposes a duty on pharmacists to their customers—that proposition is not challenged—but the specific conduct required of pharmacists in these circumstances, which we view as questions of fact informed by relevant requirements prescribed by statutes and regulations governing the practice of pharmacy and dispensing physician-prescribed controlled substances. *See Trujillo v.*

21

*Puro*, 1984-NMCA-050, ¶ 27, 101 N.M. 408, 683 P.2d 963 ("Expert testimony from a qualified doctor in the same field, familiar with the circumstances of [the] defendant's practice, the standard of care of physicians, and the testimony of [the] plaintiff, is generally sufficient to raise questions of material fact."); *Lasley*, 880 P.2d at 1132; *Dooley*, 805 S.W.2d at 384. We explain.

{29} The Pharmacy does not argue that it had no legal duty to Lucero. Indeed, the Pharmacy made reference to "duty" below and to policy considerations in this Court. Plaintiff also referenced a "duty of care" imposed by policy, statutes, and regulations in the district court and does so here. And Plaintiff has cited statutes and regulations in arguing that the standard of care required more of the Pharmacy in these circumstances than accurate filling of facially valid prescriptions. Nevertheless, the parties have not presented any developed argument addressing whether and to what extent policy considerations do or do not mandate a legal duty. Instead, the Pharmacy sought summary judgment based on the contention that its conduct met the professional standard of care for retail pharmacists, relying on the affidavit of its expert as evidence supporting that contention.[8] Thus, we interpret the question before

---

[8]The parties did not dispute below and do not dispute here that the Pharmacy's conduct must be assessed under a professional standard of care or that the standard must be established by expert testimony, although the Pharmacy says in this Court that "[u]nder the traditional theory of a liability, a pharmacist owes a duty of ordinary care in practicing his or her profession."

us as the specific conduct required by the professional standard of care in the circumstances presented here and whether that standard was met.[9]

{30}    The Pharmacy's expert advocates what amounts to a clerical-accuracy standard, requiring only that a retail pharmacist fill a prescription accurately, unless the prescription is facially invalid or the pharmacist has personal knowledge that filling the prescription would harm a specific customer, and contends that the Pharmacy met that standard. Plaintiff's expert contends that the Pharmacy's proffered standard is insufficient to fulfill the pharmacist's duty of care in the context of prescriptions for Schedule II controlled substances, relying on statutes and regulations as well as facts indicating potential abuse or diversion.

---

[9]As explained in Prosser and Keeton, the details of a defendant's conduct do not determine whether a duty exists but whether a defendant who owed a duty to the plaintiff breached the applicable standard of care:

> It is better to reserve "duty" for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, "duty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty [if it exists] is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.

Prosser & Keeton, *supra*, § 53, at 356.

**2. The Pharmacy Did Not Establish as a Matter of Law That the Clerical-Accuracy Standard Stated and Applied by Dr. Lee Is the Applicable Standard of Care or That the Pharmacy Established Compliance**

{31} A summary judgment motion must present "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." *Romero*, 2010-NMSC-035, ¶ 10 (internal quotation marks and citation omitted); *see Brown*, 1995-NMSC-050, ¶ 15 (stating that the party moving for summary judgment bears "the burden of showing the absence of any genuine issue of material fact, and also that the undisputed facts supported judgment in its favor as a matter of law"). To meet this burden on the grounds stated in its motion, the Pharmacy was required to adduce undisputed facts sufficient to establish as a matter of law that (1) its proffered standard requiring no more than clerical accuracy in filling prescriptions is the applicable standard of care in the circumstances presented here, involving multiple "early" requests for high dosages of Schedule II opioids taken with Schedule IV benzodiazepines; and (2) it complied with this standard. The Pharmacy failed to do so under both requirements.

{32} The Pharmacy's motion asserted that "the law generally imposes a high degree of care which other prudent and cautious pharmacists would exercise under similar circumstances in the trade"—a proposition consistent with the general articulation of the professional standard of care as requiring the professional "to apply the

24

knowledge, care, and skill of reasonably well-qualified professionals practicing under similar circumstances." *Buke*, 2014-NMCA-078, ¶ 50 (internal quotation marks and citation omitted). The motion relied on cases from other jurisdictions that it described as "failure to warn" cases, stating that they "are relevant to discuss the standard of care of pharmacists[.]" According to the motion, these cases "generally" hold that "there is no duty on the part of a pharmacist to monitor and intervene in a customer's use of drugs sold or otherwise act to ensure the drugs were properly prescribed by the licensed physician[,]" based on the concern that "[p]lacing these duties to warn on the pharmacist would only serve to compel the pharmacist to second guess every prescription a doctor orders in an attempt to escape liability." *Jones v. Irvin*, 602 F. Supp. 399, 402 (S.D. Ill. 1985). Thus, a pharmacist has "no duty to warn of potential hazards" and is not liable for "any resulting harm to the patients consuming the drugs if the pharmacist accurately dispenses medication pursuant to prescriptions proper on their face, unless the pharmacist knows or has reason to know that harm will occur to a specific customer."

{33} The motion concluded that Plaintiffs did not allege a failure to warn or that the Pharmacy filled prescriptions inaccurately, but that "the doctor improperly determined the appropriate drug, quantity, and dosage for . . . Lucero, an error not discovered by [the Pharmacy]." Dr. Lee's affidavit "squarely rejected" this allegation,

25

the Pharmacy contended, by opining that the prescriptions were valid and legal and that "[t]here was nothing on the face of the prescriptions, including the amounts, dosage levels, or quantity dispensed which would indicate to a prudent pharmacist that the customer was being improperly medicated or over prescribed for the condition of chronic pain." Although Dr. Lee said that he "found no violation of any federal or New Mexico statutory or regulatory requirements dealing with the practice of pharmacy[,]" and that the Pharmacy "met all applicable standards of care which apply to the practice of retail pharmacy[,]" his affidavit cited no statutes, regulations, or other authorities supporting that conclusion or his proffered clerical-accuracy standard.

{34}     In New Mexico, as in other states, the practice of pharmacy is regulated as "a professional practice affecting the public health, safety and welfare." NMSA 1978, § 61-11-1.1(A) (1997). The Pharmacy Act, NMSA 1978, §§ 61-11-1 to -18.1 (1969, as amended through 2016), created the New Mexico Board of Pharmacy (Board), *see* § 61-11-4(A), and delegated to the Board authority and responsibility for adopting rules and regulations governing the pharmacy profession in New Mexico, *see* § 61-11-6(A). The Legislature also delegated to the Board authority and responsibility for adopting rules and regulations necessary to administer New Mexico's Controlled Substances Act. *See* NMSA 1978, § 30-31-11 (1994); 16.19.20.3 NMAC. The stated

objective of these regulations is "to protect the public health and welfare of the citizens of New Mexico by controlling and monitoring access to controlled substances and to give notice of the board's designation of particular substances as controlled substances." 16.19.20.6 NMAC. One of these regulations, 16.19.20.41(A) NMAC, provides that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Federal law imposes the same "corresponding responsibility" upon pharmacists pursuant to regulations promulgated under the Controlled Substances Act, 21 U.S.C. § 829. 21 C.F.R. § 1306.04(a).

{35} Among the specific responsibilities of pharmacists imposed by the New Mexico Administrative Code is the mandatory responsibility ("shall") to review the patient's profile and, "[p]rior to dispensing any prescription," to identify issues including "clinical abuse/misuse" and "incorrect drug dosage." 16.19.4.16(D)(1)(a), (e) NMAC. "Upon recognizing any of the above, a pharmacist, using professional judgment, shall take appropriate steps to avoid or resolve the potential problem[, which] may include requesting and reviewing a controlled substance prescription monitoring [program] report [(PMP)] . . . , consulting with the prescriber and counseling the patient." 16.19.4.16(D)(2) NMAC.

27

{36}     The New Mexico Administrative Code provides additional guidelines and responsibilities applicable to opioid prescriptions, including that "[a] pharmacist shall use professional judgment based on prevailing standards of practice in determining whether to obtain and review a PMP report before dispensing an opioid prescription to that patient," 16.19.4.16(E) NMAC; and further, "shall request and review a PMP report covering at least a one[-]year time period" if the pharmacist, for example, "becomes aware of a person currently exhibiting potential abuse or misuse of opioids (i.e. over-utilization, early refills, multiple prescribers, appears overly sedated or intoxicated upon presenting a prescription for an opioid . . . , or paying cash when the patient has prescription insurance)," 16.19.4.16(E)(1)(a) NMAC; or the "pharmacist receives an initial prescription for any long-acting opioid formulations," 16.19.4.16(E)(1)(d) NMAC; or the "pharmacist becomes aware of a patient receiving an opioid concurrently with a benzodiazepine[,]"16.19.4.16(E)(1)(e) NMAC. "Upon recognizing any" of these conditions, "a pharmacist, using professional judgment, shall take appropriate steps to avoid or resolve the potential problem[,]" which "may include consulting with the prescriber and counseling the patient." 16.19.4.16(E)(3) NMAC. In addition, "a pharmacist shall use professional judgment base[d] on prevailing standards of practice, in deciding the frequency of requesting and reviewing further [PMP] reports . . . [e]xcept that PMP reports shall be reviewed a

28

minimum of once every three months during the continuous use of opioids for each established patient." 16.19.4.16(E)(4) NMAC.

{37} As noted, neither the motion nor Dr. Lee's affidavit mentions any statutes, although Plaintiff's complaint does, in its allegations supporting the claim for negligence per se. It is not for this Court to determine a professional standard of conduct for pharmacists in these circumstances. Nevertheless, we conclude that a party cannot establish a professional standard of care as a matter of law with an expert affidavit that fails to account for law applicable to the professional and/or to the particular circumstances in which the professional has acted or failed to act. *Spencer*, 2013-NMSC-010, ¶¶ 14-19 (holding that the New Mexico Rules of Professional Conduct are relevant to establish the appropriate standard of conduct for attorneys and that the determination of whether or not the defendant attorney conformed to the standard of conduct required by those rules "will depend on the evidence introduced at trial" and concluding that genuine issues of material fact existed concerning whether the defendant attorney failed to exercise reasonable skill and care in his representation of client).

{38} We recognize the existence of authority supporting the Pharmacy's proffered clerical-accuracy standard and the significance of policy concerns underlying that standard, including the potential for pharmacists intruding into the doctor-patient

relationship or practicing medicine without a license and burdening pharmacists with the responsibility of second-guessing the judgment of physicians in an effort to avoid liability. *See, e.g.*, *Kowalski v. Rose Drugs of Dardanelle, Inc.*, 378 S.W.3d 109, 119-20 (Ark. 2011); *Eldridge v. Eli Lilly & Co.*, 485 N.E.2d 551, 552-55 (Ill. App. Ct. 1985); *McKee v. Am. Home Prods. Corp.*, 782 P.2d 1045, 1051-53 (Wash. 1989) (en banc). To be sure, there are very good reasons for such concerns. But a standard of care that requires nothing more of pharmacists in the circumstances presented here—involving repeated requests for high dosages of Schedule II opioids taken with Schedule IV benzodiazepines—than that they accurately fill an apparently valid prescription raises other policy concerns related to the potential harm to patients and the public at large. These concerns are reflected in federal and state statutes and regulations, such as those discussed above.

{39}     We also note that other cases, which were not presented by the parties for the district court's consideration, have rejected the Pharmacy's proffered clerical-accuracy standard. *See, e.g.*, *Oleckna*, 162 So. 3d at 182-83 (recognizing that, in a case involving "early" fills of prescriptions for such drugs as Oxycodone and Alprazolam, refusing "to interpret a pharmacist's duty to use due and proper care in filling the prescription as being satisfied by robotic compliance with the instructions of the prescribing physician" and stating that in denying the pharmacy's motion to

30

dismiss that the court was "unwilling to hold, as a matter of law, [the p]harmacy was not negligent" (internal quotation marks and citation omitted)); *Powers v. Thobhani*, 903 So. 2d 275, 278-80 (Fla. Dist. Ct. App. 2005) (considering statutes and regulations governing pharmacists in holding that the trial court erred in dismissing negligence claims against pharmacies brought by the husband of customer who overdosed on prescribed opioids and benzodiazepenes and noting that these statutes and regulations provide a "strong policy basis" for imposing negligence liability on a pharmacy "for failing to use due and proper care in filling prescriptions, even if the prescription is filled in accordance with the physician's instruction"); *see also Lasley*, 880 P.2d at 1134 (noting that where the plaintiff presented expert affidavit stating that the pharmacist's standard of care "includes a responsibility to advise a customer of the addictive nature of a drug, to warn of the hazards of ingesting two or more drugs that adversely interact with one another, and to discuss with the physician the addictive nature of a prescribed drug and the dangers of long-term prescription of the drug" and concluding that "[o]n this record, we cannot say as a matter of law that [the pharmacy] did not breach the standard of care for the duty it owed to [the customer]"); *Horner*, 1 S.W.3d at 522-24 (rejecting accuracy standard after considering state and federal statutes related to the pharmacy profession and stating

that "[r]elegating a pharmacist to the role of order filler . . . fails to appreciate the role recognized" in the state and federal statutes).

{40} Even if the motion did adduce facts sufficient to establish the standard of care required in these circumstances, it did not establish a prima facie case that the Pharmacy complied with that standard as a matter of law. The record also shows that Lucero paid $1,107 for 90 Oxycontin 80 mg pills in September 2009 and contains an October 2009 note by Dr. Maron with the subject "Rx FRAUD?" indicating receipt of a call from a pharmacist reporting that Lucero had "presented to pharmacy for early refill" and had offered to pay over $1,000 cash, despite that she would have received the medication free via Medicaid three days later. The Administrative Code deems as indicative of "potential abuse or misuse of opioids" such factors as "early refills" and "paying cash when the patient has prescription insurance[.]" 16.19.4.16(E)(1)(a) NMAC. For this reason alone, we cannot say that the Pharmacy demonstrated as a matter of law that it "met all applicable standards of care which apply to the practice of retail pharmacy[,]" as Dr. Lee concluded.

{41} In sum, Dr. Lee's affidavit, which does not address any regulatory requirements applicable to the practice of pharmacy, or to prescriptions for Schedule II drugs, or to prescriptions for opioid medications, is insufficient to satisfy the Pharmacy's burden to demonstrate a prima facie case of entitlement to judgment as a matter of

32

law. *See Brown*, 1995-NMSC-050, ¶¶ 15-16 (reversing summary judgment because the moving party failed to develop sufficient facts to satisfy "the burden of showing the absence of any genuine issue of material fact, and also that the undisputed facts supported judgment in its favor as a matter of law"). If, on remand, the Pharmacy wishes to renew its motion for summary judgment based on the argument that it fulfilled its duty to Lucero because it conformed its conduct to the standard of care required in the circumstances presented here, it must adduce competent evidence that accounts for statutes and regulations relevant to the professional responsibilities of pharmacists filling prescriptions for the controlled substances at issue here.

**3.      The Record Shows Genuine Disputes of Material Fact Concerning the Conduct Required of a Retail Pharmacist in These Circumstances and Whether the Pharmacy's Conduct Met the Requirements**

{42}      The Pharmacy's failure to establish a prima facie case, standing alone, mandates reversal of the district court's entry of summary judgment in favor of the Pharmacy. *See, e.g.*, *id.* ¶ 8 ("[T]he non-moving party is not required to make any showing with regard to factual issues" unless "the moving party has made a prima facie case that it is entitled to summary judgment[.]" (internal quotation marks and citation omitted)). Even if the Pharmacy had carried its burden, reversal is warranted because the record viewed in the light most favorable to Plaintiff shows the existence of genuine disputes of material facts concerning the conduct required of a retail

33

pharmacist in these circumstances (standard of care) and whether the Pharmacy's conduct met those requirements.

{43} The circumstances presented here involve repeated "early" fills of opioid medications prescribed in combination with benzodiazepenes, and at least one instance in which Lucero paid a substantial amount of cash to purchase Oxycontin from the Pharmacy, although her prescriptions were paid with insurance on other occasions. In addition, Plaintiff's expert, Dr. O'Donnell, testified that "early" prescription requests "are evidence of excessive use of the [c]ontrolled [s]ubstance, in excess of the prescribed dose"; "[e]xcess use places the patient at risk ([of] death or serious injury), increases abuse, dependence, and addiction, and may be evidence of diversion"; and a pattern of "early" requests to fill prescriptions for a controlled substance "is highly suspicious of abuse and[/]or diversion, and would preclude the pharmacist" from filling the prescriptions.

{44} We disagree with the district court's view that Dr. O'Donnell's affidavit failed to show the existence of a genuine dispute of material fact because it did not "take on Dr. Lee." The affidavit leaves much to be desired, but so does Dr. Lee's affidavit. Nevertheless, Dr. O'Donnell's affidavit suffices to establish a genuine dispute about the material issues of the applicable standard of care and the Pharmacy's compliance with that standard. *See Trujillo*, 1984-NMCA-050, ¶ 27 ("Expert testimony from a

34

qualified doctor in the same field, familiar with the circumstances of [the] defendant's practice, the standard of care of physicians, and the testimony of [the] plaintiff, is generally sufficient to raise questions of material fact."); *Garcia-Montoya*, 2001-NMSC-003, ¶ 7 ("If there is the slightest doubt as to the existence of material factual issues, summary judgment should be denied." (internal quotation marks and citation omitted)); *Lasley*, 880 P.2d at 1134 (concluding that "[o]n this record, we cannot say as a matter of law that [the pharmacy] did not breach the standard of care for the duty it owed to [the customer]" in light of expert affidavit concerning pharmacist's standard of care); *Hooks*, 642 N.E.2d at 519 (affirming denial of summary judgment in pharmacy case after recognizing that "[w]hat constitutes due care in a particular case will depend upon the circumstances of that case, and will usually be a question of fact[,]" including such issues as "the frequency with which the pharmacist filled prescriptions for the customer, any representations made by the customer, the pharmacist's access to historical data about the customer, the manner in which the prescription was tendered to the pharmacists, and the like"); *Dooley*, 805 S.W.2d at 386 ("The fact that the pharmacy owes its customer a duty in dispensing prescription drugs is without question. [The defendant] simply argues that the duty to warn of potential drug interactions is not a part of its duty. The plaintiffs here have introduced expert proof disputing this assertion. Therefore, whether the duty to warn of potential

35

drug interaction is included within the pharmacist's duty to his customer is a disputed issue of fact preventing the granting of summary judgment.").

{45} The district court's criticisms of Dr. O'Donnell's affidavit reflect that the court "took an overly technical view of the evidence which did not resolve all logical inferences in favor of Plaintiff and did not view the facts in the light most favorable to a trial on the merits." *Madrid v. Brinker Rest. Corp.*, 2016-NMSC-003, ¶ 23, 363 P.3d 1197.

**4. The Pharmacy Did Not Address and the District Court Did Not Rule on the Claim for Negligence Per Se**

{46} To support a claim for negligence per se (as distinct from a negligence claim) "the regulation or statute at issue must specify a duty that is distinguishable from the ordinary standard of care[,]" rather than "impose general duties[.]" *Thompson*, 2012-NMCA-014, ¶¶ 32-33; *see Heath*, 2008-NMSC-017, ¶ 21 (explaining that, to support a claim for negligence per se, a statute or regulation must "contain a specific standard of care that does not merely repeat the common law standard").

{47} The Pharmacy's motion did not discuss (or even cite) any statutes or regulations. Nor were any specific statutes or regulations cited in Dr. Lee's affidavit or in the Pharmacy's reply brief. The motion also made no mention of the case law discussing the requirements for claims of negligence per se. The Pharmacy's argument on the point in its brief in this Court merely highlights the absence of any

such argument in its motion. We reject the Pharmacy's attempt to convince us that its motion demonstrated a prima facie case of entitlement to summary judgment on this claim and that the district court actually considered this claim in granting summary judgment. The mere fact that statutes and regulations were discussed at the motion hearing proves nothing.

{48}    We hold that the dismissal of the Pharmacy from the case was improper because the motion did not demonstrate the Pharmacy's entitlement to summary judgment on the separate and distinct claim of negligence per se, and the district court did not decide the issue.

**CONCLUSION**

{49}    For the reasons set forth herein, we reverse and remand for proceedings consistent with this opinion.

{50}    **IT IS SO ORDERED.**

_____
                                    **LINDA M. VANZI, Chief Judge**

**WE CONCUR:**


_____
**JAMES J. WECHSLER, Judge**


_____
**J. MILES HANISEE, Judge**

37